Plaintiff appeals Defendant's assessments for state income taxes for tax years 2002 and 2003 on various grounds, as explained below. Plaintiff appeared at trial on his own behalf. Defendant was represented by Allen Schweigert, an auditor with the Department of Revenue (department).
 I. STATEMENT OF FACTS
At the commencement of trial, the parties stipulated to the following facts. Plaintiff obtained an Oregon driver license on or about 1963 and has maintained that license since that time, including the years at issue. Plaintiff registered to vote in Oregon on or about 1970 and has maintained his Oregon voter registration. Plaintiff voted in Oregon in 2002 and 2003. Plaintiff has never registered to vote in Washington and has never had a Washington driver license. For the years at issue, Plaintiff owned a 1990 Dodge pickup truck that was registered in both Oregon and Washington; Plaintiff mounted the Oregon license plates to that vehicle and carried the Washington plates in the vehicle. Plaintiff was in Oregon more than 30 days in both 2002 and 2003.
The following additional facts are based on sworn testimony and exhibits submitted into evidence during the trial.
Plaintiff was born in Portland, Oregon, and raised in central Oregon. He graduated from Oregon State University (OSU) in 1969, served four years in the military, and then returned to Oregon at the end of 1973. Upon his return, Plaintiff re-enrolled at OSU, graduating in June 1976.
On or about June 15, 1976, Plaintiff accepted a job in Seattle, Washington, with the Federal Aviation Administration (FAA) as an electronics engineer. Plaintiff initially rented a room from a fellow employee in the Seattle area. After a month or two, Plaintiff moved into a 26-foot, self-contained *Page 422 
travel trailer (a Holiday Ramblette 26) in a trailer park at Boeing Field in Seattle. Plaintiff had purchased the trailer and a 1976 pickup truck in Portland, Oregon, and moved both vehicles to Seattle. The pickup truck was registered in Oregon. Plaintiff maintained the truck's Oregon registration. Plaintiff, at that time, opened a bank account with US Bank in Seattle; Plaintiff still had an account with US Bank in Redmond, Oregon, which he had opened years earlier. The trailer park at Boeing Field closed in 1977 and Plaintiff moved the travel trailer "back to Redmond" to his parents' driveway because he was traveling for work full time. At that point, Plaintiff had no home of his own. Plaintiff retained the bank accounts in Seattle and Redmond. Plaintiff continued to travel extensively (nearly 100 percent of the time) for his employer for approximately the next 10 years.
In 1980, Plaintiff purchased an airplane, an 800-square-foot single-wide mobile home, [1] and 30 acres of land in central Oregon, between Sisters and Redmond, near the area where he grew up. Plaintiff put the mobile home on the 30 acres. The home is 15 miles from the nearest town, located on the top and on the north side of a 300-foot-high mesa, and is inaccessible in the winter except by four-wheel drive due to cold weather, snow, and ice. Plaintiff spent the next three years constructing an airstrip on the property. Plaintiff stored his plane, which was registered in Oregon, at Boeing Field in Seattle for about one year before he destroyed the aircraft in a crash on a return flight from Salem, Oregon, where he had been working. Plaintiff purchased another plane a few months later. Plaintiff registered that plane in Oregon in 1985. Plaintiff stored that plane mostly in Washington until he completed construction of a hangar on his Oregon ranch sometime between 1982 and 1985, and from that time on, the plane was stored primarily in Oregon. Plaintiff did not have a telephone at his ranch and has never had mail delivered to that address. Plaintiff, however, did open a post office box in Terrebonne, Oregon, which is on *Page 423 
Highway 97 at the turnoff to his ranch, some 15 miles from that property.
In 1986, Plaintiff was moved to the regional office in Seattle "full time," although, according to his testimony, Plaintiff continued to travel between 20 and 40 percent of the time. On June 2, 1986, Plaintiff signed a rental agreement with Bow Lake Residential Community (Bow Lake), a mobile home park adjacent to SeaTac and across from the regional office where Plaintiff was working. Bow Lake allowed travel trailers, and Plaintiff moved his trailer up from his parents' property in Oregon and into that park. The trailer had a shower and was connected to the water and sewer system in the park. Bow Lake provided water (and sewer) and garbage service, and Plaintiff paid for electricity. Plaintiff did not have phone service at the trailer, and received very little mail there. Plaintiff was initially able to walk to work from Bow Lake, until his employer moved the regional office to Renton, Washington, necessitating a five-mile commute.
Plaintiff married Janine Harnden (Janine) on May 27, 2000. Plaintiff had known Janine for 20 years as a coworker and engineer at the FAA. Janine graduated from the University of Washington and had always lived in Seattle. Janine did not change her last name from Harnden to Sage after the marriage. Moreover, Plaintiff did not move in with Janine until approximately three years after the two were married. Plaintiff continued to live in the trailer at Bow Lake until approximately March 2003, despite the fact that Janine had a much larger and more comfortable stick-built home in Seattle (the Seattle home). According to the testimony, the reason Plaintiff did not initially move in with Janine was because she and her sister Janice, who along with Janice's husband Bob were living with Janine, both smoked cigarettes and Plaintiff was unwilling to be exposed to the secondhand smoke. Plaintiff terminated his lease at Bow Lake on March 31, 2003.[2] The brother-in-law Bob moved out in November 2002 and died from cancer a few months later *Page 424 
(February 2003). Janice remained in the Seattle home with Janine.
Janine had owned the Seattle home for many years before she and Plaintiff were married. Janine purchased that home by herself in the early or mid-1980s with earnings from her job with the FAA. The Seattle home is a three-bedroom, two-bath structure in a residential area, with a detached two-car garage, a deck, two sheds, a greenhouse, and a fenced back yard for the couple's Alaskan malamute. Unlike Plaintiff's vehicles, the dog is licensed in Washington.
Janine contracted Huntington's disease before she and Plaintiff were married, and was forced to retire on July 8, 2002. Janine's employer issued a Notification of Personnel Action at the time of her separation. Box 5B of that notice states that the "Nature of Action" triggering the notice was "Retirement-Disability." The same explanation appears in Box 45 of that notice. The distribution code on Janine's 2002 annuity statement is "3-Disability." Janine's sister Janice had come down with the disease in 1992 and Janine helped care for her in the Seattle home, even after Janine retired in July 2002. Janine eventually became unable to care for her sister and Plaintiff moved into the Seattle home in March 2003 to help care for the two women. They eventually hired a caregiver to help out and, at some point, the two quit smoking. Plaintiff subsequently retired on October 3, 2004.
Plaintiff retained his Oregon property and regularly traveled to Oregon from Washington to maintain his property and help his aging parents, who lived nearby in Redmond. Plaintiff stayed in his mobile home (on his 30-acre ranch with the airstrip) on those visits. Plaintiff also stayed at his Oregon property for at least part of a week each summer in connection with an annual camping trip in central Oregon with some of his coworkers.
Plaintiff has social ties to both Washington and Oregon. Plaintiff's parents live in Oregon approximately 18 miles from his property in Sisters. Plaintiff has a brother and sister-in-law living in Beaverton, Oregon, and two sisters, one living in California and the other in Missouri with her extended family. Plaintiff and Janine lived in Washington, *Page 425 
with Plaintiff's sister-in-law and, for most of 2002, the brother-in-law Bob, who died in February 2003.
As for business activities, Plaintiff has worked out of Seattle since 1976. Although he traveled extensively for work for the first 10 years, Plaintiff worked predominantly in the Seattle regional office beginning in 1986 (when he moved the travel trailer to Bow Lake) until he retired in 2004. Plaintiff's duty station was always considered Seattle.
Plaintiff had an assumed business name, Delta Sierra, registered in Oregon from 1990 through 2003. Plaintiff paid the Oregon Secretary of State to register that entity. According to the testimony, Plaintiff did not conduct any business under that name.
Plaintiff did not have his own phone in Oregon. Plaintiff's only telephone, at least since December 1996, was a cellular phone with a Seattle phone number, although he did use his parents' Oregon phone as a contact number. Plaintiff also used the work phone in Washington as a contact number. The "home phone" at the Seattle home where Plaintiff began living in March 2003 was in the sister-in-law's name (Janice Brock) because she was a retired phone company employee and telephone service was provided free of charge.[3]
Plaintiff received mail at several different addresses. When Plaintiff first went to work for the FAA in 1976, he had some of his mail sent to that address, and some to his parents' home. Plaintiff's parents forwarded the mail to him at the employer's regional office in Seattle approximately every three weeks and that office forwarded Plaintiff's mail to him in the field about once a week. After a few years Plaintiff's employer discouraged that practice. In response, Plaintiff opened the post office box in Terrebonne, Oregon, in 1980. Plaintiff used the post office box as his billing address and received much of his mail at that address. Plaintiff's parents continued to collect the mail from the post office box and forward it to him in Washington, except for checks, which they deposited in the local Oregon bank.[4] More *Page 426 
recently, Plaintiff's parents began forwarding his mail to the Seattle home shared by Plaintiff and Janine. Finally, beginning on or about March 2003, Plaintiff also received mail at the Seattle home. According to his testimony, Plaintiff still has bills, magazines, and other mail delivered to the post office box in Oregon. Plaintiff received very little mail at his trailer at Bow Lake because he was often away on business and there was no one at the park to collect his mail.
Plaintiff had bank accounts in both Oregon and Washington. Plaintiff's first account was a checking account he opened with the US Bank in Redmond, Oregon, in 1967 or 1968. In 1970, while still in the military, Plaintiff opened a joint checking, savings, line of credit, and credit card account with his parents with an institution that now operates under the name of FAA First Federal Credit Union.[5] Plaintiff opened that account, which is serviced out of Los Angeles, over the phone. That credit union loaned Plaintiff the money for his first vehicle, and Plaintiff has financed all his other vehicles, plus the two airplanes, with that institution. In 1992, the credit union opened a branch office in the building where Plaintiff was working in Seattle. Previously, there were no branches where Plaintiff lived or spent his time in Oregon or Washington, and all banking was done electronically or over the telephone. Plaintiff has retained the account with the federal credit union.
After Plaintiff went to work for the FAA in 1976, he opened a checking account with US Bank in Seattle, Washington. Plaintiff became dissatisfied with the service at US Bank and, on August 1, 1983, he closed the Seattle account with US Bank and opened a joint checking account with his parents at the First Interstate Bank in Redmond, Oregon. Thereafter, Plaintiff closed the other US Bank account in Redmond that he had opened in the 1960s. Plaintiff continued to hold the joint account at First Interstate Bank for the tax years at issue (2002 and 2003) and up to the time of trial, although the bank was acquired, and is currently operated, by Wells Fargo. In 2001, Plaintiff and Janine opened a joint checking account with Washington Mutual *Page 427 
Bank. According to the testimony, that account was opened at Janine's request. Plaintiff may have opened that account in Redmond, Oregon. The statements for that account were mailed to the Seattle home where Plaintiff began living in 2003. Finally, Plaintiff had a Capital One credit card, the statements for which were mailed to his post office box in Oregon.
The Seattle home was in Janine's name only until the home was refinanced sometime in 2003, at which time Plaintiff became a record owner. Payment for the mortgage and utilities for the Seattle home were automatically deducted from Janine's bank account, and Plaintiff reimbursed her for one-half of the cost of those services. Plaintiff had minimal services at his Oregon ranch. The home had on-site well water and septic, and electricity. The electric bill was sent to Plaintiff's local Oregon post office box in Terrebonne, and Plaintiff paid for that service with his own personal funds. Plaintiff also had water, sewer, garbage, cable TV, and electric service at the trailer at Bow Lake through March 2003. The costs for all of those services at Bow Lake, except the electricity, were included in the monthly rental space fee, which Plaintiff paid in person each month. Plaintiff was separately billed for the electric service and the bill was mailed to his post office box in Oregon. Plaintiff paid the monthly electric charge by check with funds drawn on the Wells Fargo Bank account in Oregon, although many of the checks were written while he was physically in Washington. There is no indication that Janine helped pay for any of the duplicative housing costs associated with the Washington trailer or the Oregon ranch.
Plaintiff received medical treatment in both Washington and Oregon, although Plaintiff was primarily treated in Washington. In addition to routine physical examinations, Plaintiff had MRIs, back and shoulder surgery, and other evaluations in Washington at one of three medical facilities. On three occasions during the years under appeal, Plaintiff received medical treatment in Oregon. Plaintiff had a second opinion on the condition of his back at a facility in Bend. On another occasion, Plaintiff thought he was having a heart attack and ended up in the emergency room in Redmond. Finally, Plaintiff's mother made an appointment *Page 428 
for Plaintiff to have a physical exam by Plaintiff's father's physician, and Plaintiff traveled to Oregon for that appointment.
Plaintiff was living in Washington and his social connections were primarily in that state. Plaintiff traveled to Oregon twice a year for family gatherings. He also made regular trips to visit his parents in Redmond and a friend in Milwaukie, and came down annually for a week-long camping trip in central Oregon with his coworkers. In addition to those visitations, Plaintiff takes pictures in Oregon, picks up his mail in Oregon, checks on his property, and makes repairs when time permits. Plaintiff testified that he also occasionally shops in Oregon, changes the oil in his pickup truck when he is at the ranch, and occasionally flies his plane. Plaintiff's social activities in Seattle include weekly dinners with a group of friends every Friday night at a Seattle area restaurant. Plaintiff had martial arts instructions in Washington for seven years before 2002, and held a membership at a fitness club in Washington from 1988 until either 2002 or 2003. Plaintiff also took classes in writing and photography in the Seattle area.
Plaintiff also testified about the personal property he has in Oregon and Washington. In Oregon, Plaintiff has the following personal property: a tractor, an airplane, a telescope, an x-ray machine, [6] hand tools, books, DVDs and VHS tapes, two TVs, a record player, work clothes, a canoe and trailer, several old motorcycles, the original travel trailer that Plaintiff initially lived in when he went to work in Seattle, an inoperable 1982 Mazda pickup parked next to the trailer to make it look like someone is home, a broken down 1970 Datsun 240Z sports car parked in the hangar, some old darkroom equipment, a photo printer, four guitars, three amplifiers, and some survival gear. Additionally, Plaintiff always has either his 2005 minivan or his 1990 Dodge pickup parked at his parents' home in Redmond. Those vehicles are licensed in Oregon and Washington. Plaintiff and Janine drive a 1988 Buick Regal in Seattle, and either the minivan or the 1990 Dodge pickup sit in the driveway in Seattle.[7] *Page 429 
Plaintiff's personal property in Washington consists of the following: a 1988 Buick Regal, a Holiday Ramblette travel trailer, eight guitars, one "junky" amp, photographic equipment (cameras, digital scanners and printers) that collectively cost Plaintiff approximately $40,000, three computers, thousands of landscape slides, CD and DVD players, numerous CD and DVD disks, books, weapons, martial arts gear, gym equipment, a Jacuzzi, several televisions, Plaintiff's "nice" clothes, and some home furnishings.
Plaintiff estimated the amount of time he spent in Washington and Oregon by reference to his cellular telephone bills and travel vouchers from work. Plaintiff estimated that in 2002 he spent 63 days in Oregon and 264 days in Washington, with some overlap (double counting) on days he traveled from one state to the other; in 2003, 46 days in Oregon and 277 days in Washington, again, with overlap for travel. Plaintiff estimates that he was in a state other than Washington or Oregon for at least part of 65 days in 2002 and 70 days and 2003.[8] Measured on a percentage basis, Plaintiff was in Oregon 21.6 percent of the time in 2002 and 11.7 percent of the time in 2003. He was in Washington 67.3 percent of the time in 2002 and 70.5 percent of the time in 2003.
Washington does not have a personal income tax. However, Plaintiff voluntarily had his employer withhold Oregon tax monies because he believed that it was his civic duty to pay taxes because he owned property in Oregon, and had been born and raised there. Plaintiff originally filed Oregon resident returns for 2002 and 2003. Defendant audited those returns and determined that, because Washington is a community property state, one-half of Janine's earnings belonged to Plaintiff and were subject to tax by this state. Plaintiff appealed that determination to this court, and has subsequently filed Oregon nonresident returns allocating the majority of his wages to Washington. *Page 430 
The court granted Plaintiff's motion to exclude Defendant's Exhibits B-1, B-2, C-1, and C-2. Those exhibits are blank applications for an Oregon driver license and Oregon voter registration card. The exhibits were excluded as irrelevant because they were revised January 2006 and Defendant was unaware of what, if any, changes had been made subsequent to the years at issue.
 II. ISSUES
1. Was Plaintiff domiciled in Oregon in 2002 or 2003 and subject to tax by this state?
2. If Plaintiff was a taxable Oregon domiciliary, does a part of his wife Janine's wage and retirement income paid prior to March 2003, when Plaintiff moved into Janine's Seattle home, constitute community property under Washington law subject to tax by Oregon under this state's laws; or is that income exempt under Revised Code of Washington (RCW) section 26.16.140[9]
because the parties were "living separate and apart?"
3. Is Janine's retirement income earned after July 7, 2002, "disability income" that is properly characterized under Washington law as separate property pursuant to In reMarriage of Huteson, 27 Wash App 539, 619 P2d 991 (1980) or other law, and therefore exempt from Oregon tax?
4. Is Plaintiff entitled to subtract a portion of Janine's federal pension income under ORS 316.680?
5. If Janine's income is taxable to Plaintiff, is one-half of Plaintiff's income Janine's community property, not subject to Oregon tax because she is a Washington resident?
 III. ANALYSIS
A. Residency I Domicile
Oregon taxes the income of residents of this state and the income of nonresidents with Oregon-source income. ORS316.037(1), (3).[10] Plaintiff did not have Oregon-source *Page 431 
income, which means that he can only be taxed by this state if he was an Oregon resident.
For the purposes of this case, ORS 316.027(1)(a) defines a "resident" as:
 "(A) An individual who is domiciled in this state unless the individual:
 "(i) Maintains no permanent place of abode in this state;
 "(ii) Does maintain a permanent place of abode else-where; and
 "(iii) Spends in the aggregate not more than 30 days in the taxable year in this state[.]
 "(B) An individual who is not domiciled in this state but maintains a permanent place of abode in this state and spends in the aggregate more than 200 days of the taxable year in this state unless the individual proves that the individual is in the state only for a temporary or transitory purpose."
The statute taxes residents if they are domiciled in Oregon, unless they meet one of the exceptions that either brings them within or outside of this state's taxing jurisdiction. The exceptions do not apply in this case because Plaintiff spent more than 30 days in Oregon and fewer than 200 days.[11] Thus, Plaintiff is subject to tax if he was domiciled in this state in 2002 and 2003.
The administrative rule promulgated by the Oregon Department of Revenue (department) provides that for purposes of the statute," `[d]omicile' means the place an individual considers to be the individual's true, fixed, permanent home. Domicile is the place a person intends to return to after an absence." OAR 150-316.027(1)(1)(a).[12] Residence and domicile are not the same because a person can have more than one residence but only one domicile at any given time. *Page 432 Zimmerman v. Zimmerman, 175 Or 585, 591,155 P2d 293 (1945); dela Rosa v. Dept. of Rev., 11 OTR 201,203 (1989), (citation omitted) aff'd, 313 Or 284,832 P2d 1228 (1992); OAR 150-316.027(1)(1)(a).
Plaintiff was born and raised in Oregon and, after graduating from high school in the central part of the state, he attended an Oregon university (OSU).[13] After graduating in 1969, Plaintiff spent four years in the military and then returned to Oregon to again attend OSU, completing his formal education in May 1976. There is no claim that Plaintiff abandoned his Oregon domicile while serving in the military, and the court concludes Plaintiff was an Oregon domiciliary up to the time he graduated from OSU in May of 1976. However, in June 1976, Plaintiff accepted a job with the FAA and moved to Seattle, Washington, to begin a 28-year career with that agency. The tax years at issue are 2002 and 2003, and the question is whether Plaintiff ever changed his domicile from Oregon to Washington. If he did, Oregon has no claim on his income.
For there to be a change in domicile, a person must have: "(1) [a] residence in another place, (2) an intention to abandon the old domicil[e], and (3) an intention to acquire a new domicil[e]." Elwert v. Elwert, 196 Or 256, 265,248 P2d 847 (1952) (citations omitted); see also OAR 150-316.027(1)(1)(a); and Davis v. Dept. of Rev.,13 OTR 260, 264 (1995). The difficulty courts have in determining domicile is that it is based on an individual's intent, which is "heavily steeped in the subjective view of the individual[.]" Ott v. Dept. of Rev., 16 OTR 102, 111
(2002) (citation omitted). Courts must therefore infer intent from all the facts and circumstances in a particular case, relying on overt acts to determine state of mind. See delaRosa, 11 OTR at 203 (intent inferred), aff'd,313 Or at 290 (inquiry into facts and circumstances); seeOtt, 16 OTR at 111 (overt acts determine state of mind).
The court, in this case, does not believe that Plaintiff ever abandoned his Oregon domicile, in spite of the fact that he went to work in Washington 26 years before the first tax *Page 433 
year at issue. Plaintiff accepted employment with the federal government in Seattle in 1976 and, within a few months, moved into a travel trailer in a trailer park adjacent to the regional office out of which Plaintiff worked. Plaintiff opened a bank account in Seattle. However, Plaintiff traveled for work nearly 100 percent of the time and rarely stayed at his trailer. Plaintiff had many weekends off and often traveled to Oregon to stay at his parents' home in Redmond. Plaintiff kept his Oregon joint bank account. Plaintiff never had mail delivered to his trailer in 1976 or 1977; Plaintiff had all his mail during that time sent either to his parents' home in Oregon or to the regional office in Washington. Most of the mail was sent to his parents' home, including the bill for electric service at the trailer in Washington. Plaintiff retained his Oregon driver license, and his pickup truck was registered in Oregon. Plaintiff also retained his Oregon voter registration after moving to Washington. Plaintiff never acquired a Washington driver license or registered to vote in that state. Thus, although Plaintiff had a place to stay in Washington for the first year and a half of his employment, Plaintiff appears to have never severed his ties with Oregon, and the court concludes that he did not initially abandon his Oregon domicile and acquire a Washington domicile.
The trailer park where Plaintiff had been renting space for little more than a year closed in 1977, and Plaintiff moved the trailer back to Oregon, parking it in his parents' driveway in Redmond. For the next eight years, there is no evidence that Plaintiff had any place to live in Washington. At that point, Plaintiff had a Seattle, Washington, duty station, but worked around the west and northwest and was rarely in Washington. Plaintiff continued to return to Oregon on his weekends off.
There were three significant events in 1980. First, Plaintiff purchased an airplane that he registered in Oregon. Second, and more importantly, Plaintiff purchased a 30-acre parcel of land in Oregon near his parents' home. Plaintiff improved the real property with a mobile home, an airstrip, and an airplane hangar. Third, Plaintiff opened a post office box in Terrebonne, Oregon, which was physically located near the cutoff from the highway to his ranch. According to the testimony, Plaintiff opened the post office box because his *Page 434 
employer discouraged employees from having personal mail delivered to the office. However, Plaintiff established his post office box when he acquired the 30-acre ranch, suggesting a connection between the two events. From that point on, Plaintiff used the Terrebonne post office box as his official billing address, although he continued to have some mail delivered to his parents' home in nearby Redmond.
In 1983 Plaintiff closed his Seattle checking account at US Bank and opened a joint account with his parents at First Interstate Bank in Redmond, Oregon. Shortly there-after, Plaintiff closed his other US bank account, which he had opened as a child in Redmond. At that point Plaintiff had two bank accounts, both in Oregon. Plaintiff continued to hold those two accounts up to and including the tax years at issue.
In 1986, Plaintiff was moved to the regional office in Seattle and, in June of that year, Plaintiff signed a rental agreement with Bow Lake, a trailer park adjacent to the Seattle Airport. Plaintiff moved his trailer to Bow Lake from his parents' property in Oregon. That trailer was connected to water, sewer, and electricity. Did Plaintiff become a Washington domiciliary at that time? The court believes the answer to that question is no because, although Plaintiff was now regularly working and living in Washington, he never obtained a Washington driver license or registered to vote in that state. Plaintiff's banking was associated with Oregon financial institutions and Plaintiff's mail was being delivered to Oregon. Plaintiff did not have a phone at his Bow Lake trailer or have any mail delivered to that locale.
Plaintiff registered a business in Oregon in 1990 and kept that registration active until 2003. Plaintiff obtained a cell phone with a Seattle telephone number in 1996, but he was also still using his parents' home phone as a contact number. Plaintiff still owned significant property in Oregon and he retained all of his other Oregon connections (driver license, vehicle registration, voter registration, banking, and mail).
Plaintiff did marry a lifelong Washington resident in May 2000 and opened a joint account with Janine the following year, but Plaintiff continued to reside in his trailer at Bow *Page 435 
Lake until March 2003. At that point, Plaintiff was spending the majority of his time in Washington — he was living and working in that state and spending less time in Oregon due to medical problems afflicting Janine and sister-in-law Janice. However, under Washington's community property laws, the Seattle home was Janine's separate property because it was acquired before the marriage. See
RCW 26.16.020 (providing that property of wife acquired before marriage is not subject to the debts or contracts of the husband), [14] RCW 26.16.030 (defining community property as property "acquired after marriage by either husband or wife or both"). Meanwhile, Plaintiff still owned his Oregon ranch. And, throughout the nearly 30 years Plaintiff worked in Seattle, he retained his Oregon driver license and Oregon vehicle and voter registrations. Plaintiff has never registered to vote in Washington and has never had a Washington driver license. Not only did Plaintiff retain his Oregon voter registration, Plaintiff voted in Oregon in 2002 and 2003, which are the tax years at issue. Plaintiff had two vehicles registered in Oregon and the only vehicle registered in Washington was a Buick Regal that appears to be Janine's car. Significantly, Plaintiff asked his employer to withhold Oregon income taxes from his paychecks throughout the time that he worked for the FAA out of the Seattle office because, according to the testimony, Plaintiff "thought [he] was probably still an Oregon resident." Plaintiff candidly acknowledged that, although he operated under such an assumption, he believes an argument could be made that he was, in fact, domiciled in Washington. The court disagrees and, on the evidence before it, concludes that Plaintiff did not abandon his Oregon domicile and acquire a Washington domicile prior to December 31, 2003. Accordingly, his wages in 2002 and 2003 are subject to Oregon tax.
B. Were Plaintiff and Janine Living Separate and ApartUnder RCW 26.16.140?
Defendant contends that under Washington's community property laws, half of Plaintiff's wife Janine's income is taxable to Plaintiff. Plaintiff disagrees, arguing that he and *Page 436 
Janine were living separate and apart until March 2003 and, under Washington law, Janine's income was her separate property.
Plaintiff was married in May 2000. However, Plaintiff did not move in with Janine after the couple was married, choosing instead to continue living in his trailer at Bow Lake while Janine lived in her Seattle home. Plaintiff eventually moved in with Janine, in Janine's home, in March 2003. It appears that the primary reason Plaintiff moved into Janine's home was to help care for Janine and her sister once Janine's disease progressed to the point where she needed assistance and could no longer aid her sister. Under those facts, were the parties living separate and apart as provided in RCW 26.16.140?
Oregon imposes a tax on residents "measured by taxable income wherever derived." ORS 316.007. Oregon taxable income of residents is defined as federal taxable income with certain modifications not here relevant. ORS 316.048. Ordinarily, when only one spouse lives in Oregon, and that spouse files a separate return, the Oregon tax is computed as if federal adjusted gross income is computed separately, in accordance with ORS 316.122(3). However, Oregon has an administrative rule that applies to Oregon residents with spouses residing in a community property state such as Washington. In such circumstances, the portion of the spouse's community property belonging to the Oregon resident is taxable to the Oregon resident.
The department's administrative rule, OAR 150-316.048(4), provides that:
 "An Oregon resident whose spouse resides in a community property state is taxable upon the share of the spouse's community property income that is considered earned by the Oregon resident according to the laws of the community property state."
Under Washington law, community property includes all property "acquired after marriage by either husband or wife *Page 437 
or both" other than by gift, bequest, or inheritance. RCW 26.16.030. Under the statute, Janine's income was community property beginning in May 2000. As such, a portion of her income belonged to Plaintiff and would generally be subject to tax by Oregon based on this court's determination that Plaintiff was an Oregon resident. See generally Keller v.Dept. of Rev., 292 Or 639, 642 P2d 284 (1982) (affirming Tax Court's decision approving Department of Revenue's inclusion of one-half of Washington spouse's earnings in Oregon resident spouse's gross income). Plaintiff, however, believes that under RCW 26.16.140, the income Janine received before the two began living together in March 2003 was separate as opposed to community property and was therefore not taxable by Oregon.
RCW 26.16.140 provides that "[w]hen a husband and wife are living separate and apart, their respective earnings and accumulations shall be the separate property of each." (Emphasis added.) The question, then, is whether the couple was living "separate and apart." For the reasons set forth below, court concludes they were not.
The Supreme Court of Washington has interpreted RCW 26.16.140
to require "permanent separation of the parties — a defunct marriage." Seizer v. Sessions,132 Wash 2d 642, 649, 940 P2d 261 (1997) (en banc), citing Aetna LifeIns. Co. v. Bunt, 110 Wash 2d 368, 372, 754 P2d 993
(1988). The court in Seizer stated that "[m]ere physical separation does not dissolve the community * * * but it is not necessary for purposes of RCW 26.16.140 that a dissolution action be final or even pending." Seizer,132 Wash 2d at 657 (citation omitted). The court went on to say that it had "found a marriage defunct under RCW 26.16.140 only when the facts involved situations where both parties demonstrated the marriage was over." Id. The parties must "no longer have the will to continue the marital relationship." Id. at 658.
Rustad v. Rustad, 61 Wash 2d 176, 179-80, 377 P2d 414
(1963), is a case where mere physical separation did not render property acquired during separation separate as opposed to community property. In that case, the Washington *Page 438 
Supreme Court ruled that acquisitions by the husband during a long separation from his wife, due to his wife's confinement in a mental institution, were not separate property, but community property.
In Keller, an en banc decision of the Oregon Supreme Court, Justice Linde, writing for a unanimous court, noted that RCW 26.16.140 was amended to add the words "and apart" to the applicable phrase in the statute ("living separate and apart") "to distinguish between the mere fact of separate residences and a separation due to a breakup or abandonment of the marital relationship." Keller, 292 Or at 643. Justice Linde noted that "[o]nly the latter causes the spouses' acquisitions in Washington to be separate rather than community property."Id. The plaintiff in Keller was an Oregon resident whose husband lived and worked in Washington.Id. at 641. The parties stipulated to the fact that there was no discord in the marriage. Accordingly, one-half of the Plaintiff's husband's Washington earnings were properly included in the Plaintiff's gross income and taxed by the state of Oregon.
Similarly, there is in the present case no evidence of a "defunct marriage." Seizer, 132 Wash 2d at 649. Plaintiff does not contend that his choice to live in his trailer separate from Janine was "due to a breakup or abandonment of the marital relationship." Keller,292 Or at 643. Nor is there evidence that Plaintiff's marriage was over; that he and Janine lacked "the will to continue the marital relationship." Seizer, 132 Wash 2d at 657,658. On the contrary, after nearly three years of living in separate residences, Plaintiff moved into Janine's home in Seattle. That move-in occurred in the early part of the second of the two years under appeal. That action tends to show that the parties were moving closer together rather than farther apart. Moreover, according to Plaintiff's testimony, the reason he and Janine initially did not live together is that Janine and her sister both smoked and Plaintiff was concerned for his health. Accordingly, the court concludes that Plaintiff did not have a "defunct marriage" and that Janine's earnings were not her separate property under RCW 26.16.140. Rather, Janine's earnings were community property under RCW 26.16.030, subject to tax by Oregon under ORS 316.007 and OAR 150-316.048(4). *Page 439 
C. Disability Retirement Income — Separate orCommunity Property?
The next question is whether the income Janine received after she retired on July 8, 2002, was "disability" income that should be characterized under Washington law as separate property pursuant to Huteson or other law. If so, none of that income could be taxed by Oregon.
Huteson involved a suit by appellant wife against respondent husband for a portion of appellant's disability pension, appellant contending that the pension was community property. Huteson, 27 Wash App at 540. Respondent inHuteson was a fireman in Vancouver, Washington, who retired on full disability following a heart attack suffered approximately seven months after he was permanently separated from his wife of 10 years. Id. at 540. Respondent had been a fireman for less than five years before the injury and by state law was not vested in the state's retirement system.Id. The decree of dissolution did not award appellant wife any portion of respondent's disability pension.Id. at 540, 541. The trial court found that the disability income compensated respondent for loss of future income and, as such, was not a community asset. Id.
at 541. The Court of Appeals affirmed, concluding that the disability pension was separate as opposed to community property because "[t]he disability was an instantaneous occurrence affecting respondent's future earning ability only[.]" Id. at 541. The court concluded that there were no elements of deferred compensation in the disability award, and that the award was "logically distinguishable from the retirement benefit, which is earned and thus acquired over a term of years." Id. at 541, 542.
Application of Huteson to Plaintiff's case herein produces exactly the opposite result Plaintiff seeks because that case involved disability payments "designed to compensate solely for loss of future earnings," where the disability occurred after dissolution of the marriage. Id.
at 543. Here, there is no dissolution of the marriage; rather, the benefits were paid during the marriage. Because Washington courts conclude that disability benefits generally are intended to compensate for loss of future earnings, containing no elements of deferred compensation, they are characterized as *Page 440 
community property under RCW 26.16.030 when received during the marriage. On the other hand, disability payments received after dissolution of the marriage, meant solely to compensate the individual for lost future wages, are considered separate as opposed to community property. In re Marriage ofKollmer, 73 Wash App 373, 375, 870 P2d 978 (1994) ("[disability payments which are solely meant to compensate an individual for lost post-dissolution wages are not considered an asset divisible upon dissolution") (citing In reMarriage of Nuss, 65 Wash App 334, 343, 828 P2d 627
(1992); In re Marriage of Anglin, 52 Wash App 317,324, 759 P2d 1224 (1988)). The rationale is tied to Washington's community property laws, which provide generally that property acquired during a marriage is community property, whereas property acquired outside of marriage is generally considered separate property. See RCW 26.16.010 and RCW 26.16.020 (property owned before marriage by husband or wife is separate property of each); RCW 26.16.030 (property acquired after marriage is community property); RCW 26.16.140
(property acquired after separation is separate property).
Case law from Washington reveals that the fundamental distinction between disability and retirement benefits is that the disability benefits represent payments for lost future wages, whereas retirement benefits are characterized as deferred compensation for past services, earned and acquired over a term of years by virtue of the labors of the employed individual on behalf of the community. Huteson,27 Wash App at 542; In re Marriage of Brewer,137 Wash 2d 756, 770, 976 P2d 102 (1999), citing In re Marriage ofBrown, 100 Wash 2d 729, 675 P2d 1207 (1984);Nuss, 65 Wash App at 343. Typically there is no element of deferred compensation or retirement involved with disability payments and they are therefore not "earned," as are retirement benefits. Arnold v. Department of RetirementSystems, 128 Wash 2d 765, 778, 912 P2d 463 (1996); seealso Kollmer, 73 Wash App 373.
In this case, Plaintiff contends that Janine's benefits were "disability" benefits. If that is true, they represent payment for lost future wages that Janine presumably would have continued to earn but for her cessation of employment because of her disability. As such, they would be community *Page 441 
property because the benefits were acquired during the marriage. Consequently, one-half of those earnings would be taxable by Oregon because Plaintiff was an Oregon resident for the years at issue.
On the other hand, if the payments were in the nature of deferred compensation for past services, they would more appropriately be characterized as "retirement" income, and only the portion "earned during the existence of the community" would constitute community property belonging in part to Plaintiff and taxable by Oregon. Kollmer,73 Wash App at 375, citing Nuss, 65 Wash App at 343. Plaintiff and Janine were only married for two of the 26 years Janine worked and, if the benefits were actually retirement benefits, they were earned largely outside the marriage and would be mostly separate as opposed to community property. As such, only a small portion would be taxable by Oregon. The Washington Supreme Court has stated that because property acquired after (i.e., during) marriage is presumed to be community property, "retirement income is appropriately characterized as deferred compensation for past services[,] [and] that portion * * * earned during the existence of the community may be divisible as community property in a dissolution proceeding."Arnold, 128 Wash 2d at 777-78, citing Bakenhus v.City of Seattle, 48 Wash 2d 695, 296 P2d 536 (1956).
The Arnold court noted that "[o]ur courts have * * * looked carefully at the payment received by the pension system member to determine whether the payment has characteristics of an earned pension in addition to disability." Arnold,128 Wash 2d at 778-79. In some instances, Washington courts find benefits paid to a spouse to have components of both disability and retirement pay, as in Arnold, and in others the court disregards the nature of the acquisition of the benefits received, as in Brewer. Brewer held that monthly payments to a permanently disabled spouse under two private disability policies paid after the dissolution of the marriage constituted separate property, even though the policy was acquired during the marriage with community funds. However, the cases make clear that the court needs sufficient information about the benefits in order to determine an appropriate characterization as community or separate. *Page 442 
There is insufficient evidence for the court to determine whether the disputed benefits are more appropriately characterized as disability or retirement benefits, or an amalgam of the two. Consequently, the court cannot definitively say whether the benefits were separate or community property. In this state of the record, the court accepts Plaintiff's characterization of the benefits as disability, but concludes that the benefits are community property, taxable by Oregon under Oregon law because the parties were married when the benefits were paid.
D. Application of ORS 316.680 to Janine's federal pensionincome
Plaintiff's wife Janine received wages as compensation for services rendered for one-half of the 2002 tax year (from January 1, 2002 through July 8, 2002). Thereafter, through December 31, 2003, the end of the second year at issue, Janine was receiving federal disability retirement income.
ORS 316.680(1)(f)(A) provides a subtraction from federal taxable income for "[f]ederal pension income that is attributable to federal employment occurring before October 1, 1991." The statute defines federal pension income as "any form of retirement allowance provided by the federal government, its agencies or its instrumentalities to retirees of the federal government." ORS 316.680(f)(C)(ii). Under that broad definition, Janine's income after she ceased working was "federal pension income" regardless of whether it was "disability" or "retirement" income.
The statute sets forth a ratio for the allowable subtraction, "determined by multiplying the total amount of federal pension income for the tax year by the ratio of the number of months of federal creditable service occurring before October 1, 1991, over the total number of months of federal creditable service." ORS 316.680(1)(f)(A).
Defendant acknowledged in its Answer that "plaintiff may be entitled to the federal pension income subtraction under ORS316.680 however; the department does not have *Page 443 
enough information to calculate the percentage of the subtraction." Defendant further stated in its Answer that "plaintiff makes reference to a 60% exclusion which may or may not be accurate!,]" and that without information on "the number of months of federal service before and after October 1, 1991[] * * * the exclusion percentage is unknown."
According to the evidence, Janine began working for the federal government on September 15, 1976, and retired July 8, 2002. According to the applicable annual annuity statements, Janine's 2002 annuity was $15,288.67 and her 2003 annuity was $38,988.00. Plaintiff calculated the number of months of service before October 1, 1991, to be 180 months, and the total months of service to be 310, resulting in a federal subtraction of 58.1 percent. Defendant did not challenge that calculation in trial. The court finds that Plaintiff's calculation is correct. Therefore, Plaintiff is allowed a federal taxable income subtraction under the statute for the years at issue based on the pension income and subtraction percentage set forth above.
E. Do Washington's community property laws render a portionof Plaintiff's income nontaxable because it belonged to Janine,a Washington resident?
Plaintiff's final argument is that if Janine's income is taxable to him, one-half of Plaintiff's income belongs to Janine under Washington's community property laws, and is therefore not subject to Oregon tax because she is a Washington resident and the income is non-Oregon source. Although that is indeed an interesting proposition, it is not supported by law. Plaintiff's income is taxable by Oregon because he was an Oregon resident. Washington's community property laws do not affect the taxability of an Oregon resident's earned income.
 III. CONCLUSION
After a careful and exhaustive review of the facts and applicable law, the court concludes that:
Plaintiff was domiciled in Oregon in 2002 and 2003 and is subject to tax by this state as an Oregon resident; *Page 444 
Plaintiff and his wife Janine were not living "separate and apart" as provided in RCW section 26.16.140 and, therefore, under Oregon's tax laws, most notably ORS 316.007 and OAR 150-316.048(4), and Washington's community property laws, one-half of Janine's earnings belonged to Plaintiff and are taxable by Oregon;
Although there is insufficient evidence for the court to determine whether Janine was receiving "disability" or "retirement" benefits, the court accepts Plaintiff's characterization of those benefits as disability, but concludes that the benefits are taxable by Oregon because the parties were married and, as explained above, the benefits constituted community property intended to compensate Janine for lost future wages;
Plaintiff is entitled to a federal tax subtraction under ORS316.680(1)(f)(A) based on a ratio of 58.1 percent applied to federal pension income of $15,288.67 in 2002 and $38,988.00 in 2003;
Application of Washington's community property laws, where Plaintiff is an Oregon resident and his spouse is a Washington resident, does not operate to exempt one-half of Plaintiff's income from Oregon tax. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted in part and denied in part consistent with the court's Decision as set forth above.
[1] The court is aware that the terminology has changed over the years, and that these homes are now typically referred to as manufactured homes, no doubt due, at least in part, to the fact they are generally moved once to a property and affixed rather permanently. However, throughout the trial, Plaintiff referred to his single-wide home as a mobile home.
[2] Plaintiff had been staying at his wife's home at least some of the time before the March 31, 2003, lease termination, but did not officially move into Janine's home until sometime in March 2003.
[3] Both Janice and Bob worked for the phone company.
[4] Plaintiff testified that he gave his parents power-of-attorney, which enabled them to handle his banking.
[5] Plaintiff was able to open the account with the FAA credit union because his father worked for the FAA.
[6] Plaintiff bought the x-ray machine from a hospital because he wanted the transformer to conduct experiments.
[7] Plaintiff testified that he uses the minivan and Dodge pickup to travel back and forth from Washington to Oregon; thus, one of those vehicles is always in Washington and the other in Oregon (except when the vehicle is being driven from one location to the other). Plaintiff may drive down to Oregon in the minivan and drive home in the pickup, or vice versa.
[8] The numbers suggest that Plaintiff traveled on 27 days in 2002 and 28 days in 2003, on which occasions he was in two (or more) states traveling to or from Washington.
[9] All references to the Revised Code of Washington (RCW) are to 2002.
[10] All references to the Oregon Revised Statutes (ORS) are to 2001.
[11] Accordingly, the exception in ORS 316.027(1)(a)(A)(iii) exempting Oregon domiciliaries from tax because of the limited amount of time they spend in this state is inapplicable, as is the provision in paragraph (a)(B) of the statute, which subjects nondomiciliaries to Oregon's tax because they have a permanent place of abode in Oregon and spend the requisite amount of time (more than 200 days) in this state.
[12] All references to the Oregon Administrative Rules (OAR) are to 2001.
[13] As indicated earlier in the Decision, Plaintiff attended Oregon State University (OSU), which is in Corvallis.
[14] RCW 26.16.010 contains a reciprocal provision exempting property of the husband from the contracts and debts of the wife. *Page 445