## RONALD and JANE HUDSPETH v. DEPARTMENT OF REVENUE

James F. Bodie, Bodie, Minturn & Glantz, Prineville, represented plaintiffs.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiffs rendered January 19, 1971.

CARLISLE B. ROBERTS, Judge.

The taxpayers appealed from the Department of Revenue's Order No. I-70-8, assessing additional personal income taxes for the years 1965 and 1966 for income received during the period March 1965 to June 1966, while the taxpayers were physically absent from the state, on the ground that they continued to be legally domiciled in Oregon throughout the period.

The facts are not contested. Ronald J. Hudspeth

was brought to Prineville, Oregon, by his parents in 1936 when he was three years old. He is now married and has children. The operations of his father and of his uncle in cattle and lumber were extensive and he was trained by his father in these businesses. Among the operations in which he was involved was the San Juan Lumber Company which owned a lumber mill in Pagosa Springs, Colorado, but depended entirely upon U.S. Forest Service timber for raw material. The management of this mill became Ronald Hudspeth's chief activity in 1963 and he commuted between Prineville, Oregon, and Pagosa Springs (generally flying his own airplane). It was soon made clear to him by the Forest Service in Colorado that it did not believe the mill could be successful unless he spent his full time in its management. The timber contracts were dependent on his fulfillment of obligations to the Forest Service. On March 13, 1965, he and his wife and children moved to Albuquerque, New Mexico (220 miles from Pagosa Springs) where he had an established base, and where office help and housing could be located with less difficulty than in Pagosa Springs. In June 1965, the family moved to Pagosa Springs, his elder child having completed her school year and the requirements of the mill clearly demanding his full time without the loss caused by commuting. The family returned to Prineville in June of 1966 and have continued to reside there since. It was the view of the Department of Revenue that a lifelong resident of Oregon had not abandoned his Oregon domicile for a relatively short sojourn in connection with an ailing business which, when sufficiently strengthened, was once again left in the hands of subordinates. The jurisdiction of the state to tax domiciliaries upon all their income, no matter from whence derived, and

even during protracted absences from the state, is unquestioned. ORS 316.055. Were the plaintiffs domiciled outside Oregon during the period described?

As stated by Mr. Justice LUSK in *In re Noyes' Estate*, 182 Or 1, 185 P2d 555 (1947), at pp 14-15:

> "The factors which the courts consider in determining domicile, and the weight and importance to be attached to various types of evidence, are fully discussed in Reed's Will [48 Or 500, 87 P 763 (1906)] and the more recent Zimmerman case [*Zimmerman v. Zimmerman*, 175 Or 585, 155 P2d 293 (1945)]. It is sufficient to say here that to constitute domicile there must be both the fact of a fixed habitation or abode in a particular place and an intention to remain there permanently and indefinitely; and that to constitute change of domicile three things are essential: (1) residence in another place; (2) an intention to abandon the old domicile; and (3) an intention of acquiring a new one. *Reed's Will*, supra, 504, 508."

The law of domicile is well established but the application of its rules is difficult in many instances because of the requirement that the *intent* of an individual who is capable of acquiring a "domicile of choice" (see *Zimmerman v. Zimmerman*, 175 Or 585, 591, 155 P2d 293 (1945)) must be definitely ascertained. Intent, too often, must be inferred. The intent to abandon the old domicile and the intent to acquire a new domicile, locked in the individual's mind, may not have been attained with the problems of domicile consciously considered. Regrettably, there have been instances in which the individual subsequently found it to his advantage to deny his intent. Self-serving statements are therefore suspect and the triers of the fact of domicile rely heavily upon the overt acts of the individual as true indicators of his state of mind.

Nevertheless, the whole aim of the inquiry is to discern the true intent. The evidential value of each act must be measured with caution, since, in many cases, no particular act is wholly persuasive on either side of the argument. *Volmer v. Volmer*, 231 Or 57, 61, 371 P2d 70 (1962).

In the present instance, with the advantages of hindsight, the Department of Revenue looks askance at a statement of domiciliary change which has within it a substantial tax advantage, in the case of an individual who has been a lifelong resident of Oregon and who, upon leaving the state, returns to it permanently within little more than a 16 months' absence. In addition, with reference to intent, the defendant noted that the plaintiffs did not sell their home in Prineville, that the husband continued his Oregon Elks Lodge membership, that his Oregon voting registration remained on the books, that he maintained a bank account in Prineville, that he paid dues at the golf club in Prineville, that he purchased no home in the city of Albuquerque, New Mexico, and made use of a mobile home in Pagosa Springs, Colorado. It did note that he had purchased Colorado automobile license plates.

The testimony of the plaintiff-husband, none of which was contradicted by the defendant, indicated that the plaintiff-husband was probably the most active manager or executive in the family at the time. Much of the family property was being sold to meet creditors' demands and the best possibility of salvage was to reinstate the Colorado mill as a going concern, but this depended to a large degree upon the personal relationship of Ronald Hudspeth and the officials of the Forestry Service in Colorado where Hudspeth pur-

chases of timber were in default. Ronald Hudspeth testified that he sought to meet the problems while commuting but, finding this impossible, after much consideration, determined to move permanently. A number of factors relating to family relationships stimulated this move, in addition to business reasons.

He tried to sell his Prineville home but found no takers for a property worth $70,000 to $80,000 prior to his eventual return to Oregon. His Oregon Elks Lodge membership and his dues at the local golf club were paid as a matter of routine by the Prineville comptroller of the family operations. His Oregon voting registration had not had time to expire before his return to Oregon and he did not vote by absentee ballot during his absence. His bank account in Prineville was used as a matter of convenience by the plaintiffs and the family comptroller for several local transactions but Mr. Hudspeth also had bank accounts in Albuquerque and in Pagosa Springs. He lived in rented quarters in Albuquerque while commuting to Pagosa Springs. Finding that he must be close to the mill, he developed a trailer site adjacent to the mill and utilized a mobile home, as did other key employees brought in by him for work in the mill. Acceptable housing was unavailable in the small town of Pagosa Springs and he made plans for building a permanent home there. He testified that he actually had no time to take care of or give consideration to minor matters such as shifting bank accounts, cutting down on dues payments, and the like, during this period. However, about the time the Colorado property appeared to be operating with relative smoothness, it became apparent that the same kind of trouble shooting was necessary on his part in the business in Prineville and

he felt forced to abandon his newly acquired domicile and to return to Oregon.

██ Mrs. Ronald Hudspeth testified, "I left for good." She was referring to the family's departure from Prineville for Albuquerque. The court believed her and was equally impressed by the testimony given by Mr. Hudspeth. As has been stated, intent is the key to the question. *Godfrey v. Godfrey*, 228 Or 228, 233, 364 P2d 620 (1961); *Elwert v. Elwert*, 196 Or 256, 248 P2d 847 (1952). Intent must be determined as to each step of the attempted change in domicile as taken; hindsight is to be regarded with suspicion. Overt acts are significant as they are related to the particular time. Motive for the change is not determinative in and of itself. Duration need not be permanent. While it is necessary that the person must move with the intention of making the new dwelling place his home, the fact that the first dwelling acquired is temporary does not vitiate the transfer. *Zimmerman v. Zimmerman, supra.*

The court as a trier of fact was impressed by the character of the plaintiffs and believes that their evidence attests to a legal change of domicile for the period here involved. The change was not pretended; it was bona fide. Each of the acts of the plaintiffs which, in the aggregate, led to the defendant's determination to tax, has been adequately explained. The defendant's Order No. I-70-8 must be set aside and held for naught, the returns of the plaintiffs for the years 1965 and 1966 being approved and accepted as filed. The plaintiffs are entitled to costs.