# IN THE OREGON TAX COURT
## MAGISTRATE DIVISION

Lyle M. THOMPSON
and Shirley A. Thompson,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC-MD 991027C)

John Magliana, Portland, argued the cause for Plaintiffs.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant.

Decision for Defendant rendered June 12, 2000.

### DAN ROBINSON, Magistrate.

Plaintiffs appealed Defendant's assessment of additional taxes for 1996 stemming from income Plaintiffs received from the sale of a business in Oregon. Plaintiffs contend they were no longer residents at the time of the sale and that the income is therefore not subject to tax by this state. A trial was held January 5, 2000. Plaintiffs were represented by John Magliana, Attorney at Law. Defendant was represented by Jerry Bronner, Assistant Attorney General. Each side presented sworn testimony through several witnesses. Post-trial briefs were filed and the record closed February 29, 2000.

## STATEMENT OF FACTS

Plaintiffs were domiciled in Oregon prior to January 1, 1996. They lived in a home they owned on SW Heron Court in Beaverton. Since 1983, Lyle Thompson (Thompson) had been a shareholder in Beaverton Funeral Home, Inc., an Oregon corporation, and was employed as its funeral director until he sold all of his stock to a publicly traded company (the Loewen Group International, Inc.) on March 28, 1996. Thompson continued to work for the business on a consulting basis after the sale.

According to the sworn testimony, Plaintiffs began contemplating their retirement and decided to move to the bordering State of Washington. Plaintiffs had previously owned property (one undeveloped acre) in Washington and, like most people in Oregon, were aware that Washington does not impose a tax on income. Plaintiffs had a real estate professional estimate the value of their home in September 1995 and met with an Oregon attorney, in the fall of 1995, to discuss the tax consequences of the anticipated sale of the funeral home stock. The representation included advice on the law of residency and domicile in Oregon.

Plaintiffs' attorney issued a detailed letter on the relevant law, including the element of intent and burden of

proof, dated December 27, 1995. Thompson testified that he understood he needed to be moved before the sale of the stock occurred in order to avoid paying taxes to Oregon.

Continuing with their planning, Plaintiffs met with a Washington builder in January 1996 to discuss the construction of a home in that state. Sometime thereafter, they began meeting routinely with the builder and, on April 26, 1996, roughly one month after the sale of the business, Plaintiffs signed a contract for the purchase of a lot in Camas, Washington, and for the construction of a home on that property. The home was completed September 4, 1996.

Meanwhile, in the latter part of January 1996 Plaintiffs began packing their personal belongings. They opened a bank account (checking and savings) and rented a post office box in Washington on February 29, 1996. Plaintiffs completed a rental application for a townhouse in Vancouver on March 14, 1996, that was approved on or about March 20. Plaintiffs rented that townhouse until their home was completed in September. The rental agreement provided for prorated rent from March 20 to March 31, 1996, with an agreement to lease the apartment for a six-month period thereafter. Plaintiffs' electricity service at the Washington townhouse began on March 20, 1996, and their telephone service was activated April 2, 1996. They ordered the phone service in late March but, as is not uncommon, it took some time for the phone company to act on the request.

It was not until approximately March 10, 1996, that Plaintiffs knew for certain that the business was being sold to Loewen. According to Thompson's testimony, the target date for the sale was April 15. On March 16, 1996, Plaintiffs went on a planned two week vacation to Escondido, California. Friends joined them the following week. Plaintiffs kenneled their dog at Cooper Mountain Kennel in Beaverton while on vacation. Apparently, the vacation was to end on March 30. However, while on vacation Plaintiffs learned that the closing date for the sale had been accelerated to March 28, 1996. They apparently approved the accelerated sale date by phone on March 24. Plaintiffs cut short their vacation and returned by plane to Oregon on March 26.

Plaintiffs arrived at the Portland International Airport around dinner time on March 26 and went to the

Vancouver apartment complex to sign the formal rental agreement after inspecting their unit. According to the testimony, they then drove across the river to Oregon, retrieved their dog from the kennel in Beaverton, and drove to the funeral home to borrow a full-sized van to use in transporting their belongings from Beaverton to Vancouver. Richard Hansen, an employee of the Beaverton Funeral Home, testified that he personally checked out the van to Plaintiffs. He remembered the event because it was unusual—Thompson never borrowed the company van. Hansen offered to help Plaintiffs move, but Thompson responded that everything was packed and ready to go and he and his wife could handle it.

Thompson testified that he and his wife made two trips to Vancouver that night with their belongings in the van and the trunk of their car. Packing was relatively easy because most items were already in boxes. The drive from Beaverton to Vancouver, according to Thompson's sworn testimony, took 45 minutes. Plaintiffs insist they moved much of their belongings that night, March 26. Additional items were apparently moved the following day. Thompson testified that after moving all of their belongings on the night of March 26, they unpacked at least some items that night before going to bed, in Vancouver. They slept on the double bed that was set up that night. Thompson testified that they slept in Vancouver every night after March 26, except for a few occasions when they stayed in the Beaverton home with their grown children, who met them there before going to the beach.

Thompson testified that the following items were moved the night of March 26: a card table and four chairs, which they used as a dining room table in Vancouver; a television; a sofa/hide-a-bed; a television stand; a recliner; a double bed; some clothes; kitchen utensils; china; figurines worth about $250 each (referred to as collectibles); bedding; boxes containing records, etc.; golf clubs; and their toiletries. Plaintiffs also moved their dog. According to the sworn testimony, there were enough boxes that they were stacked three high along the wall of the second bedroom and in the garage of the Vancouver townhouse. Although some of the items were heavy, Thompson testified that as a funeral home director he

was accustomed to carrying heavy objects. They had in the past moved on a number of occasions, always making the move themselves. There was testimony by Plaintiffs' accountant that the Thompsons are organized and frugal.

Plaintiffs admit that some belongings were left in the Beaverton home for several months after the purported move. That was done for two reasons. One reasons was that the townhouse was not large enough to store all their belongings that had come to fill a 2,700 square foot house. The other reason was that the Beaverton home was for sale and the Realtor suggested it would be easier to sell if the house was furnished. In reviewing Plaintiffs' Exhibit 31, it appears that most of the furniture was left behind, including a china cabinet, a number of dressers and night stands, more than a dozen chairs, a dining room set, a console TV, recliners, a washer and dryer, and a barbeque. The mover's list includes 100 items, many of them substantial pieces of furniture.

Plaintiffs accepted an offer on their Beaverton home May 15, 1996, and closed July 1. The items left in the home were kept there until July 3, two days after the closing date, which began with an accepted offer on May 15. It became necessary for Plaintiffs to rent their home from the buyers for two days and hire a moving company to move their furniture. Plaintiffs paid the movers $1,400. The home was first listed for sale April 13, 1996, as a one-party listing agreement. No sale resulted. Plaintiffs then executed a full-listing agreement on May 9, 1996, which eventually led to a sale of the home. The May 9 listing agreement indicates that the house was owner-occupied and lists Plaintiffs' address as 15425 SW Heron Court in Beaverton. By the terms of the agreement, the home could be shown only by appointment. There was no lock box for key storage. Plaintiffs' agent had the key and had to be phoned by any agent wanting to show the home to a client.

Plaintiffs also retained residential services at the Beaverton home for the phone, cable TV, water, electricity, and garbage for several months after renting the Washington townhouse. Plaintiffs did not obtain cable TV service at the Vancouver townhouse. Plaintiffs left their answering

machine in Beaverton and retrieved many telephone messages at that location after March 26. They made all of their outgoing long distance calls (more than 100) from their Beaverton home through the month of June. No long distance calls were made from their Vancouver townhouse between March 26 and the end of June.

According to the testimony, Thompson returned to Beaverton almost daily after moving to Vancouver. His wife often accompanied him. The routine often included going to breakfast with friends, or having coffee with a group Thompson had been involved with for years, and stopping by the house to check the mail, retrieve phone messages and work on the house and yard. To facilitate the sale of the home, Thompson testified that he performed ongoing yard maintenance (fertilizing and mowing the lawn and killing weeds), patched the walls, and did some interior painting. Thompson also met with a representative regarding problems with the L.P. siding. Other reasons given for Plaintiffs' frequent contacts with Oregon were that his mother lives in Oregon, the Thompsons' doctors and dentists were in Oregon, and they attended church in Portland. At the time of trial Plaintiffs were still attending the Portland church.

Plaintiffs continued the insurance coverage on the contents of the Beaverton home after renting their townhouse in Washington. They did not obtain insurance on the belongings in the townhouse. Plaintiffs registered to vote in Washington on October 9, 1996, and Thompson obtained a Washington Driver License November 19, 1996.

Plaintiffs did not terminate mail service at the Beaverton home until July 1, 1996. They received many important papers at that location, including matters related to investment and finance. In the month of April 1996, most commercial transactions (dining out and retail shopping) occurred in Oregon.

## ISSUE

Did Plaintiffs change their domicile from Oregon to Washington prior to the March 28, 1996, sale of their stock in the Beaverton Funeral Home?

## ANALYSIS

 Oregon imposes an income tax on the taxable income of every resident of this state. ORS 316.037.[1] The term resident is statutorily equated with domicile. *See* ORS 316.027(1)(a).[2] However, the two terms are not synonymous. *Reed's Will*, 48 Or 500, 504, 87 P 763 (1904). Because the statute defines a resident as one domiciled in this state, the court's analysis will focus on the meaning of the latter term.[3]

 Domicile is a common-law concept comprised of two components: "a fixed habitation or abode in a particular place" and "an intention to remain there permanently or indefinitely." *dela Rosa v. Dept. of Rev.*, 313 Or 284, 289 (citing *Elwert v. Elwert*, 196 Or 256, 265, 248 P2d 847 (1952)). Domicile can be thought of as one's true home, whereas residence is a factual place of abode. *dela Rosa v. Dept. of Rev.*, 313 Or 284, 289, 832 P2d 1228 (1992). "An individual acquires a domicile by living there, even for a brief period of time, with no definite intention of moving. It is the place to which a person has the intent of returning after an absence." OAR 150-316.027(1)(a).[4] Although a taxpayer can have more than one residence, he can have but one domicile. *Ramsey v. Dept. of Rev.*, 7 OTR 478, 481 (1978); *Zimmerman v. Zimmerman*, 175 Or 585, 591, 155 P2d 293 (1945); OAR 150-316.027(1)(a). The determination, although based on intent, must be established by all the facts and circumstances of the situation rather than the statements of the individual, which

---

[1] Reference to the Oregon Revised Statutes (ORS) is to the law in effect in 1996.

[2] ORS 316.027(1) provides, in part:

" 'Resident' or 'resident of this state' means:

"(a) An individual who is domiciled in this state * * *."

[3] *See* footnote 2 above, which sets out the relevant text of ORS 316.027(1)(a) defining resident.

[4] The Department of Revenue has defined "domicile" in its administrative rules as follows:

" 'Domicile' means the place an individual considers to be their true, fixed, permanent home. A person can only have one domicile. An individual acquires a domicile by living there, even for a brief period of time, with no definite intention of moving. It is the place to which a person has the intent of returning after an absence. Factors that contribute to determining domicile include family, business activities and social connections."

OAR 150-316.027(1)(a).

are often self serving. *dela Rosa*, 313 Or at 289-90; *Hudspeth v. Dept. of Rev.*, 4 OTR 296, 298 (1971).

Plaintiffs acknowledge that they began calendar year 1996 as Oregon domiciliaries. "The law is also clear that once domicile is established or determined to be in a particular location, it remains there until the person establishes a new domicile." *Duncan v. Department of Revenue*, OTC-RD No. 4315, WL 792454 at 1 (Nov 3, 1998).

■ A person establishes a new domicile by demonstrating the following:

1. The specific intent to abandon the old domicile;

2. The specific intent to acquire a new domicile; and

3. Actual physical presence for some period in the new domicile after the intent to stay is formed. OAR 150-316.027.

Plaintiffs in this case clearly intended to move permanently to Washington at some point. They sought legal advice from a Portland attorney concerning "residency for purposes of Oregon income tax." Plaintiffs did in fact move to Washington, and after temporarily living in an apartment in Vancouver, settled into a custom built house in Camas where they live to this day. The question is when did Plaintiffs move? The timing is particularly critical in this case because the purported move took place on the evening of March 26 and the sale of the stock generating the disputed income occurred on March 29, less than three days later. Plaintiffs received over $1 million and the tax consequences are substantial.

This is a difficult case and fairly challenges the law of domicile as it relates to state income taxes. However, after thoughtfully and carefully weighing the evidence, the court does not believe Plaintiffs abandoned their Oregon domicile before March 29. Although there are facts tending to support Plaintiffs' position, the circumstances, taken as a whole, argue for a contrary result. Given that the move was planned for some time, and that Thompson met with an attorney to discuss the matter of residency, Plaintiffs should have more

definitively established a break from Oregon. In other words, this is at best a close call and the facts should have been more compelling. This perhaps underscores the difficulty Plaintiffs had extricating themselves from their home in Beaverton.

The court is satisfied that Plaintiffs established a residence in Washington before March 29. Thus, one of the three requirements for showing a change of domicile is satisfied. *See* OAR 150-316.027(2). However, as previously discussed, a person can have several residences but only one domicile at any given time. *Ramsey*, 7 OTR at 481. The other two factors, both dealing with domicile, prove fatal to Plaintiffs' claim. Plaintiffs have not adequately demonstrated that they abandoned their Oregon domicile and acquired a new domicile in Washington.

There is considerable circumstantial evidence to suggest Plaintiffs did not truly leave Oregon until perhaps July 1. Plaintiffs have offered reasonable explanations for each item of apparently damaging evidence. However, as the evidence mounts, the weight becomes almost unbearable. The court finds the following facts compelling.

Plaintiffs did not put their house up for sale until six weeks after the purported move to Vancouver. Plaintiffs kept the Beaverton home fully furnished for several months after they say they moved, and took relatively little with them to the Vancouver apartment. Plaintiffs kept their cable TV (expanded basic) and garbage service in Beaverton for three months after moving to Vancouver. They did not arrange for cable TV service in Vancouver. That is perhaps understandable in the short run, but Plaintiffs accepted an offer for the purchase of the home May 15 and yet continued the cable service through June, allegedly because the sale may have fallen through. That explanation seems inconsistent with the testimony that Plaintiffs are frugal individuals.[5]

Additionally, all of Plaintiffs' roughly 100 long distance phone calls during the three months in question (April

---

[5] Plaintiffs' CPA, Nancy Botteri, testified that Plaintiffs are frugal and conservative. She explained that Shirley Thompson took care of the interior decorating at the funeral home and Lyle Thompson kept the books. Paying for cable TV and garbage service in a home one no longer lives in does not strike the court as frugal.

through June) originated from the Beaverton home and some would have cost less or been toll free if made from Vancouver. Added to that is the fact that on some days calls were made hours apart (April 4 - 9:51 a.m. and 9:28 p.m.) or throughout the day,[6] which tends to contradict Thompson's testimony that he merely stopped in for an hour or so each day. It also makes it difficult to believe Plaintiffs actually slept in Vancouver. Additionally, Plaintiffs say they took their dog with them to Vancouver, yet they did not pay a pet deposit on the Vancouver townhouse. The evidence shows that pets are allowed but, by policy, deposits were required.

Another compelling fact is that virtually no electricity was used in Vancouver each month while the usage in Beaverton remained fairly constant. Electricity charges in Beaverton for the month of March (Feb 23 - Mar 26) was $57.29 and the following month was $58.15. The charges for the next two months were $48.14 and $50.14. Plaintiffs' Vancouver electricity bill during April, May, and June was roughly $15 per month, and $6 of that amount was the fixed monthly service charge. Also, Plaintiffs continued to have most of their mail delivered to Beaverton until July 1, even though they rented a post office box in Vancouver in February. That mail included important financial documents. It is unusual for someone to move and purposefully continue to have their mail delivered to their old address.

The final striking fact is that Plaintiffs, who are experienced business operators who pay careful attention to details, continued to insure the contents of the Beaverton home after the alleged move and did not obtain insurance on the belongings moved to Vancouver, which were said to include china and other valuables.

Plaintiffs have an explanation for each bit of apparently damaging circumstantial evidence set out above. The insurance was overlooked. The house was not immediately marketed because Plaintiffs wanted to fix it up before selling it. They kept the house furnished because it would "show" better and thereby accelerate the sale.[7] The cable was for the

---

[6] For example, on May 17 there were calls at 8:34 a.m., 8:47 a.m., 1:36 p.m., 6:52 p.m., and 10:04 p.m.

[7] That explanation is inconsistent with the fact that Plaintiffs waited more than a month to list the home.

benefit of Realtors who might be showing the home. Cable was unnecessary in Vancouver because they had good reception there. Thompson testified that the Beaverton phone was used for cost and convenience. Because most of their friends lived in Oregon, they could reach them without incurring long distance charges, by leaving a message on Plaintiffs' answering machine. However, Plaintiffs' Washington friends could have avoided long distance charges if they were given Plaintiffs' Vancouver number and similarly Plaintiffs could have avoided many of their long distance charges to the Vancouver/Orchards area by placing their calls from Vancouver. Many of the long distance calls were to Plaintiffs' daughter in Washington. Plaintiffs argue that the electricity remained high in Beaverton because Thompson and his wife frequently vacuumed, even after the contract for sale was entered into on May 15. Also, the heat, which is gas but has an electric blower, was set at 69 degrees and the air conditioner was set for 74 degrees. Thus, some electricity was consumed maintaining a consistent room temperature. As for the lack of a pet deposit, Thompson testified that he negotiated the matter and persuaded the former manager, Jennifer Werden, to waive the fee. Defendant argues the fee was not paid because the dog, and Plaintiffs, were rarely at the apartment. That is certainly a possibility. Taken as a whole, Plaintiffs' explanations are not sufficiently persuasive.

Plaintiffs did have the testimony of a former neighbor in Vancouver, Nancy Crimmins, who said she saw Plaintiffs walk their dog daily after moving into the townhouse. She signed a statement that said Plaintiffs "lived at 3100 SE 168th Ave., Unit # 267, Vancouver, Wash. from March 26, 1996 to Sept. 23, 1996." However, that evidence was inconclusive and not particularly helpful because Crimmins was unable at trial to recall any details about when Plaintiffs actually moved in and how often they were around some five years ago. Moreover, her signed statement involves a legal conclusion and is hardly definitive.

Assuming Plaintiffs did in fact sleep in Vancouver all but a few nights in the three months at issue, it is still not clear to the court that Plaintiffs abandoned their Oregon domicile. The extent of activity in and around Beaverton, which was virtually daily, leads the court to conclude that Plaintiffs had not truly abandoned Oregon and moved to

Washington. One additional fact is noteworthy. Much of the belongings that were transported to Vancouver were kept in boxes in the garage and second bedroom until Plaintiffs moved to their new home in Camas. That suggests Plaintiffs did not view Vancouver as their true home.

■ Viewing the evidence as a whole, the court believes Plaintiffs' Vancouver apartment was not a permanent home but rather a transitory residence, obtained to establish domicile in that state. *See* OAR 150-316.027(1)(b). " 'The intention required for the acquisition of a domicil[e] of choice is an intention to make a home in fact, and not an intention to acquire a domicil[e].' " *Zimmerman*, 175 Or at 592-93, *quoting Restatement, Conflict of Laws* (1934).

When asked on direct examination what he did upon returning from vacation on March 26, Thompson testified that he "established residence in Washington." That testimony reveals much about the case and goes to the heart of the matter. Plaintiffs undertook certain activity to establish residence, but in their hearts, and, the court believes, in reality, they continued to "live" in Oregon, regardless of where they may have slept. There are many published opinions wherein a taxpayer physically left the State of Oregon but was nonetheless found to be an Oregon domiciliary for income tax purposes. In discussing the concepts of residence and domicile, the court in *Zimmerman* set out the following excerpt from the *Restatement, Conflict of Laws* (1934):

> "§ 13. A home is a dwelling place of a person, distinguished from other dwelling places of that person by the intimacy of the relation between the person and the place."

*Zimmerman*, 175 Or at 592.

### CONCLUSION

After a thorough review of the facts and the law, the court is not persuaded that Plaintiffs abandoned their old domicile in Oregon and acquired a new domicile in Washington on or before March 28, 1996. Plaintiffs acquired a Washington residence and, the court believes, tried to comply with their understanding of the law of residence and domicile, but did not extricate themselves from their Beaverton home to the extent necessary to convince the court that they

home to the extent necessary to convince the court that they abandoned their Oregon domicile. Accordingly, the income Plaintiffs received from the sale of the stock in the Beaverton Funeral Home on March 28, 1996, is taxable by the State of Oregon.

IT IS THE DECISION OF THIS COURT that Plaintiffs' requested relief, in the form of an order abating the tax, penalties, and interest and holding the sale of the stock not taxable by the State of Oregon, is denied.