DECISION
Plaintiffs appeal Defendant's Notices of Deficiency Assessment dated October 7, 2008, for tax years 2003, 2004, and 2005.
A trial was held at the Oregon Tax Court, Salem, on December 7, 2009. Kirk A. McCarville, Attorney at Law, appeared on behalf of Plaintiffs. Dewane K. Brueske (Dewane) and Myla R. Brueske (Myla) testified.[1]
James C. Wallace, Assistant Attorney General, appeared on behalf of Defendant. Anthony King (King), tax auditor, testified.
As a preliminary matter, Plaintiffs offered their exhibits into evidence without objection. Defendant offered its exhibits into evidence with an objection by Plaintiffs to Defendant's Exhibit F 2-8. The court received Plaintiffs' Exhibits 1 through 20 and Defendant's Exhibits A through I, except for Defendant's Exhibit F 2-8.
Post-trial memoranda were submitted by Plaintiffs on January 11, 2010, and by Defendant on January 11, 2010. This matter is now ready for decision. *Page 2 
 I. STATEMENT OF FACTS
A. Initial Move to Oregon: 1980 through 1990
Plaintiffs originally moved to Oregon in 1980 when Dewane accepted a position at a hospital located in Walla Walla, Washington (Walla Walla). (Def s Ex A at 4-5.) Dewane testified that his parents were living in Walla Walla at the time; his father worked at the same hospital. Dewane testified that he did not have any contacts with Oregon prior to 1980.
Plaintiffs purchased a 24.5 acre parcel of land with a residence (the Weston home) near Weston, Oregon (Weston).[2] (Def s Ex H at 2 ¶ 5.) Dewane testified that during the mid-1980s, he and Myla improved the area above the three-car garage, turning it into a master bedroom with a study and worship area. Dewane testified that he and Myla adopted two newborn children. The first child was adopted in 1985 and the second in 1986.
Dewane testified that during the 1980s, he typically worked fifteen 24-hour shifts per month in the hospital emergency department. He also provided services to inmates at the state penitentiary, established a clinic in Weston, assisted with ambulance services in Oregon and Washington, served on the hospital board, and taught classes at the community college in Walla Walla.
B. First Move to Arizona: 1990 through 1993
In 1990, Dewane sought new employment because Myla could no longer tolerate his 110-120 hour work weeks. (Def s Ex A at 6.) Dewane testified that he conducted a nationwide search and found a position at the Yuma Regional Medical Center Emergency Department in Yuma, Arizona (Yuma). The position required him to work only 35 hours per week. (Id.) Dewane testified that he also worked part-time in California. *Page 3 
Myla testified that Plaintiffs adopted three children from Romania in 1991 and a fourth in 1996. Between 1990 and 1993, Myla home-schooled their children. (Id.)
From 1990 through 1993, Plaintiffs rented a house in Arizona. (Def s Ex A at 7.) Plaintiffs listed the Weston home for sale with a real estate agent in Pendleton, Oregon between 1990 and 1993, but it did not sell. (Def s Ex A at 6, 7.) Myla testified that she believes the house did not sell because of its remote location. Dewane estimated that, between 1990 and 1993, "[m]aybe a fourth of the time [the family was] up in Oregon." (Def s Ex A at 6.) Otherwise, the Weston home was vacant between 1990 and 1993. (Def s Ex A at 7.)
C. Second Move to Oregon: 1993 through 1997
In 1993, Dewane's employer lost its contract with the Yuma emergency department and Dewane lost his job with less than 30 days' notice. (Def s Ex A at 6.) Plaintiffs returned to the Weston home. (Id.) Dewane testified that, due to the short notice of termination, he looked for jobs only in states where he had medical licenses: Arizona, California, and Oregon. He testified that he found a job in La Grande, Oregon as medical director of the hospital's emergency department; this position required him to work numerous 24-hour shifts.
Between 1993 and 1997, Plaintiffs added to their own six children when they took in two high school girls from their church.[3] Myla testified that the older of the two girls lived at the Weston home until about 2000 and the younger until about 2003. Plaintiffs testified that at some point during the mid-1990s, an older Romanian girl also lived at the Weston home and helped to look after the children. *Page 4 
D. Second Move to Arizona: 1997 through 2003
In 1997, a friend offered Dewane a job as Yuma Regional Medical Center Assistant Director of Emergency Services. (Def s Ex A at 7, 9.) Dewane accepted this position and shortly thereafter was a founding member of Southwest Emergency Physicians, LLC (SWEP), located in Yuma. (Def s Ex H at 3 ¶ 11.) He has worked continuously as the Medical Director for SWEP since 1997. (Def s Ex H at 3 ¶¶ 11, 12.) Additionally, Dewane served as the medical director of Sun Care Air Ambulance in Yuma. (Def s Ex A at 10; Def s Ex B at 19-20.) When asked whether his years as the medical director of Sun Care Air Ambulance included 2003 through 2005, Dewane responded, "Yeah, I think so." (Def s Ex A at 10.)
Dewane testified that joining SWEP as a partner provided him with more job security than he had enjoyed when he worked in Arizona between 1990 and 1993. He testified that, when he took this position, he was "working in the direction" of making Arizona his permanent home and intended to stay for the rest of his life.
From 1997 through 2001, Dewane rented a one-room apartment in Yuma. (Def s Ex H at 3 ¶ 14.)
In 2001, Plaintiffs purchased a two-bedroom house in Yuma (the Yuma home). (Def s Ex H at 3 ¶ 15; Def s Ex A at 9.) Dewane testified that in 2001, they added a pool to entertain the children and moved some furniture from Oregon to Arizona, including beds, chairs, and kitchen items. Myla testified that they also purchased furniture in Arizona, including a dining set and a sofa. Plaintiffs maintained insurance for the Yuma home with Farmers Insurance Company of Arizona from 2001 to the present. (Ptfs' Ex 10 at 1.)
Dewane testified that he and Myla bought the Yuma home with the intention that it would be their retirement home. Defendant questioned at trial whether Plaintiffs truly intended to retire in Yuma, pointing to a statement made by Myla in a letter dated April 4, 2007. The *Page 5 
letter states: "Is there no way we can keep the home [in Weston] in case we would want to retire there some day?" (Def s Ex B at 30-31.) On cross-examination, Myla testified that by "we" she meant herself and Dewane, though she had no knowledge or recollection of whether Dewane was with her at the time she wrote the letter or whether he was aware of the letter. She testified that she is emotionally attached to the house and has entertained the possibility of retiring there.
Both Plaintiffs testified that at some point after 1997, they attempted to sell the Weston home. However, neither could recall the specific dates that the house was listed. Myla testified that they listed the house with a realtor in Walla Walla and, again, it did not sell.
In 2000, Plaintiffs expanded their Weston property by purchasing a 37-acre parcel from a neighbor. (Def s Ex H at 2 ¶ 5.) Dewane testified that, around this time, he and Myla began constructing an attached apartment for his parents on the property.
Dewane testified that the children continued to live at the Weston home after he returned to Yuma in 1997. (Def s Ex A at 8.) He testified that the children attended school in Oregon through eighth grade and thereafter attended school in Washington. Dewane testified that he did not want to move the children to schools in Yuma due to drug and gang problems. Myla testified that the children did not want to move because they were invested in their school and friends.
Between 1997 and 2001, Dewane traveled to Oregon two or three times a month; the family typically visited him in Yuma during spring, summer, and holiday breaks from school. (Def s Ex A at 8.) He testified that the family usually drove to Arizona for visits. Dewane testified that purchasing the Yuma home in 2001 made it easier for the family to visit; however, he did not recall a change in the frequency of visits after purchasing the Yuma home.
E. Tax Years: 2003 through 2005
Dewane testified that he was concerned that he should file his income tax return as an Arizona resident in 2003 because he was living and working in Arizona, and all of his children *Page 6 
were attending school in Washington. He testified that he called the Arizona Department of Revenue and spoke with an employee for about ten minutes; he did not recall with whom he spoke. He testified that, during this conversation, he explained his situation and the employee concluded that he was definitely an Arizona resident.
Dewane testified that, based in part on this conversation, he and his Certified Public Accountant (CPA) decided that he should file as an Arizona resident in 2003. He testified that his CPA chose February 15, 2003, as the date that his residency changed because that was a date on which Plaintiffs had moved more furniture from Oregon to Arizona. He testified that this was not the only date that they considered. He testified that he and his CPA had discussed his residency prior to 2003. He testified that, while his CPA had never asked him to fill out a formal residency questionnaire, they typically discussed numerous factors pertaining to residency, including the connections that his wife and children maintained to Oregon.
In 2003, Plaintiffs' five children were ages 21, 18, 17, 17, and 13. (Def s Ex H at 4 ¶ 23.) Dewane testified that, in 2003, the oldest child was in college, the three middle children were in high school, and the youngest child was in eighth grade, all at schools in Washington.[4] The children all lived at the Weston home.[5]
(Def s Ex H at 4 ¶ 24.) Dewane's mother also lived at the Weston home between 2003 and 2005.[6] (Def s Ex H at 4 ¶ 22.) Dewane testified that by "lived at the home," he meant that she received her mail and kept some possessions at the house.[7] *Page 7 
By 2003, all but one of the children could drive; Myla was no longer required to transport the children to school. She visited Arizona once every month or two. (Def s Ex A at 16.)
Dewane's work schedules during the tax years at issue indicate that he typically took between 10 and 12 days off each month, [8] including two to five consecutive non-working days up to four times each month.[9]
(Ptfs' Exs 14-16.) Dewane testified that he typically visited Oregon twice a month in 2003, 2004, and 2005. (Def s Ex A at 16.) A review of documents provided by Plaintiffs to Defendant pertaining to travel by Plaintiffs and their children in 2003, 2004, and 2005, confirms that Dewane frequently[10] visited Oregon during his time off[11] (Def s Ex D at 162-210; Def s Ex C at 83-123.) Dewane testified that he probably spent more than 30 days in Oregon in 2003, 2004, and 2005.
Dewane testified that he occasionally traveled to locations other than Oregon during this time off. Travel documents provided by Plaintiffs to Defendant indicate that Dewane traveled to Canada in July 2004 and to Montana in July-August 2005.[12] (Def s Ex C at 109; Def s Ex D at 200; Def s Ex C at 118-119.) A review of credit card and bank statements from the tax years at issue provided by Plaintiffs to Defendant indicates that Plaintiffs likely traveled to Peru in March 2003 and to Canada in July 2003 and July 2004.[13] (Def s Ex D at 78; Def s Ex C at 11, 24.) *Page 8 
F. Organizational membership and contributions
Dewane testified that, from 1994 through 1997, the family attended a church in Oregon. He testified that, when he moved to Arizona in 1997, he did not find a new church to attend at that time. Dewane testified that each church keeps a membership list and that, in 2004 or 2005, his entire family changed its membership to a church in Washington where the children were attending school. Dewane testified that he now attends a church in Yuma but has never changed his membership from the church in Washington. (Def s Ex A at 10.)
During the tax years at issue, Dewane made charitable contributions to organizations in Oregon, Washington, Arizona, California, Maryland, Illinois, Nebraska, and to national and international organizations. (Def s Ex C at 125-155; Def s Ex D at 33-55.)
G. Professional licensure
Dewane received an Oregon medical license in October 1983. (Def s Ex H at 2 ¶ 8.) He maintained his Oregon medical license at an active status until January 2006; since January 2006, he has maintained it at an inactive status. (Def s Ex H at 2 ¶ 8.) Dewane testified that he maintained an active Oregon medical license until 2006 because he often helped family members and others with various minor medical issues when he visited Oregon. (Def s Ex A at 20.) He testified that he has maintained his Oregon medical license as "a sort of job security;" it takes a "lot of time" to get a license so he did not "want to let it expire."
Dewane received an Arizona medical license in May 1990.[14] (Def s Ex H at 3 ¶ 10.)
Dewane testified that he maintained a Washington medical license during the 1980s but allowed it to lapse at some point after 1990. *Page 9 
H. Driver license, vehicle registration, and voter registration
Both Plaintiffs obtained Oregon driver licenses and registered to vote in Oregon in the early 1980s. (Def s Ex H at 2 ¶ 6.) Dewane obtained an Arizona driver license and registered to vote in Arizona on July 5, 2006. (Id.)
Plaintiffs jointly registered six vehicles in Oregon between 2004 and 2007. (Def s Ex F at 1.) Plaintiffs jointly registered two vehicles in 2002 and 2005; the vehicles were re-registered by Myla alone in 2004 and 2007. (Id.) Dewane testified that he has maintained the Oregon vehicle registrations because these vehicles are used by Myla and the children.
Only one vehicle was registered in Arizona between 2003 and 2005. (Def s Ex A at 25-26.) Plaintiffs registered another vehicle in Arizona in July 2006. (Def s Ex A at 26.)
Between 1990 and 1993, Plaintiffs traveled between Oregon and Arizona in their own plane. (Def s Ex A at 19.) Plaintiffs sold their plane in the 1990s because Dewane was the only one using it; it was no longer cost effective. (Def s Ex A at 20.) Dewane still has his aviation license; it is a federal license. (Id.)
I. Bank accounts
Plaintiffs opened joint checking and savings accounts at Baker Boyer Bank in Washington in the early 1980s. (Def s Ex A at 11, 23.) During the tax years at issue, Plaintiffs still had auto loans from Baker Boyer Bank, the most recent of which was taken out in 2000. (Def s Ex A at 11, 16.) During the tax years at issue, Plaintiffs also had several credit cards with MBNA and Bank of America. (Def s Ex C at 4-81; Def s Ex D at 64-68.) Additionally, Plaintiffs maintain checking accounts at banks in Minnesota and Canada. (Def s Ex A at 23-24.) *Page 10 
Dewane has a checking account with the Foothills Bank in Yuma. (Def s Ex A at 22.) Dewane testified that, as of 2001, the Foothills Bank was his primary bank. Plaintiffs received a loan for the Yuma home from Chase Manhattan Bank. (Def s Ex A at 11.)
Dewane testified that the children have bank accounts with Bank of America.
J. Mailing address
Dewane testified that, when he moved to Arizona, he did not notify banks or credit card companies of a change in address; he maintained the Oregon address because he preferred that Myla sort through the mail. He testified that, even today, some mail is sent to the Oregon address. He testified that the maintenance man periodically takes the mail into the house.
Dewane testified that the SWEP LLC agreement currently lists the Oregon address; he used this address when he formed the group in 1998 and never thought to change it.
Plaintiffs used their Arizona address on all of their federal tax returns for tax years 2003, 2004, and 2005. (Def s Ex B at 35, 49; Def s Ex D at 19.) Checks written from Plaintiffs account with the Foothills bank in Arizona in 2005 all include Plaintiffs' Arizona address.[15] (Def s Ex D at 56-63.) Finally, Plaintiffs changed their mailing address with Baker Boyer Bank to the Arizona address during the summer of 2008. (Def s Ex A at 16.)
K. Farming activities
Plaintiffs listed income and expenses associated with farming activities on their 2003, 2004, and 2005 federal income tax returns. (Ptfs' Ex 1 at 8; Ptfs' Ex 4 at 7; Ptfs' Ex 7 at 7.) Dewane testified that he does not specifically recall these expenses; however, he believed that they were probably associated with the children's farming activities at the Weston property. During 2001, Plaintiffs had 45 sheep, a few horses, chickens, llamas, an orchard, and a garden. *Page 11 
(Def s Ex A at 12.) Plaintiffs' children sold apple cider, eggs, wool, soap, and candles, though they never made a profit. (Def s Ex A at 12, 17.) The family had sold their sheep and llamas by 2003, but still owned three or four horses during 2003 through 2005. (Def s Ex A at 12-13.)
Plaintiffs own about 65 acres of Ponderosa Pine trees. (Def s Ex A at 11.) Plaintiffs did not plant the trees, but they did attempt to cultivate them through thinning and trimming. (Id.) At some point, a man offered to harvest and sell some of the trees for transplant in California, but this successfully occurred only once. (Def s Ex A at 25.)
L. Other Arizona connections
In 2005, Dewane was named in a lawsuit, along with SWEP and the Yuma Regional Medical Center, filed in the Yuma County Superior Court. (Ptfs' Exs 19, 20.) The Yuma Regional Medical Center was represented by Arizona counsel. (Ptfs' Ex 19 at 14.)
 II. ISSUE
The issue presented in this case is whether Dewane Brueske was a resident of the State of Oregon within the meaning of ORS 316.027
during tax years 2003, 2004, and 2005. Whether Myla Brueske was a resident of Oregon during tax years 2003, 2004, and 2005 is not at issue because the parties have stipulated that she was an Oregon resident. (Def s Ex H at 2 ¶ 7.)
 III. ANALYSIS
Oregon imposes a state income tax on every resident of this state and every nonresident with Oregon-source income. ORS 316.037(1), (3).[16]
Oregon defines a "resident" as "[a]n individual who is domiciled in this state * * *." ORS 316.027(l)(a)(A). Thus, residency is statutorily equated with domicile. Domicile is a common-law concept composed of two components: (1) "a fixed habitation or abode in a particular place" and (2) "an intention to *Page 12 
remain there permanently or indefinitely." dela Rosa v. Dept. of Rev.
(dela Rosa), 313 Or 284, 289, 832 P2d 1228 (1992). Oregon Administrative Rule (OAR) 150-316.027(1)(1)(a) defines "domicile" as "the place an individual considers to be the individual's true, fixed, permanent home" and as "the place a person intends to return to after an absence."[17]
While an individual can have more than one residence, he "can have but one domicile." dela Rosa, 313 Or at 289.
Plaintiffs do not dispute that Dewane was at one time domiciled in Oregon. Rather, Plaintiffs contend that "as early as 2001, and certainly no later [than] 2003," Dewane changed his domicile from Oregon to Arizona. (Ptfs' Pretrial Mem at 5.) Thus, the question before the court is whether Dewane had changed his domicile from Oregon to Arizona by 2003.
To effect a change of domicile, "three elements are necessary: (1) the person must establish a residence in another place; (2) form an intent to abandon the old domicile; and (3) intend to acquire a new domicile."White v. Dept. of Rev. (White), 14 OTR 319, 321 (1998). Given the inherent difficulties in ascertaining intent, "triers of the fact of domicile rely heavily upon the overt acts of the individual as true indicators of his state of mind. Nevertheless, the whole aim of the inquiry is to discern the true intent." Hudspeth v. Dept. of Rev.
(Hudspeth), 4 OTR 296, 298 (1971). Thus, "determination of an individual's domicile is based on intent supported by facts and circumstances rather than merely the statements of the individual."Butler v. Dept. of Rev. (Butler), TC-MD No 050801D, WL 2041284 at *4 (July 18, 2006). Factors contributing to a determination of domicile "include family, business activities[,] and social connections." OAR 150-316.027(1)(1)(a). Plaintiffs have the burden of proving by a preponderance of the evidence that Dewane was not an Oregon domiciliary in tax years 2003, 2004, and 2005. ORS 305.427. *Page 13 
A. Residence in Arizona
"[A] residence for purposes of the [three-part] test is simply an abode. * * * [A]n abode is any `physical building, structure, or vehicle in which the taxpayer lives and sleeps.'" Bleasdell v. Dept. of Rev.
(Bleasdell), 18 OTR-MD 354, 361 (2004). There is no question that Dewane had established a residence in Arizona by 2003. Indeed, he established a residence in Arizona as early as 1997 when he began renting a room in the state. See, e.g., Butler, WL 2041284 at *4 (Plaintiff "established a residence in Virginia when she rented an apartment").
B. Intent to abandon Oregon domicile
Even though Dewane maintained numerous ties to Oregon during the tax years at issue, the court concludes Dewane had, by 2003, formed the requisite intent to abandon his Oregon domicile. Dewane's ties to Oregon included his joint ownership interest in a home in Oregon where his wife, children, and mother continued to reside. The home was on a large tract of land, that included a garden, an orchard, and a forest, from which Plaintiffs and their children harvested and sold various products. Dewane maintained an active Oregon medical license. He retained his membership with a church in Washington, near the Weston home. He also retained his Oregon driver license, his Oregon voter registration, and Oregon registration of six vehicles. He retained checking and savings accounts at a bank in Washington, near the Weston home. He continued to use his Oregon address as his primary mailing address for bank and credit card statements and on his SWEP, LLC agreement. Finally, he often visited his family during time off from work; typically, he traveled to Oregon once or twice a month.
Most of Dewane's Oregon connections were established well before Dewane accepted his current position in Arizona and were retained primarily for the benefit of his wife and children, all of whom were Oregon residents during 2003 through 2005. First, Dewane testified *Page 14 
that he maintained the Weston home primarily because it served as a dormitory for his children while they attended nearby schools and because he had not been able to sell it during either of the times that it was listed. Second, Dewane testified that his children were responsible for most of the farming activities; they sold apple cider, eggs, wool, soap, and candles. Third, Dewane testified that he retained Oregon registration of six vehicles because these vehicles were driven by his wife and children. He had registered his personal vehicle in Arizona by 2003. Finally, Dewane testified that he retained his Oregon mailing address for numerous financial statements largely as a matter of convenience. Given his very full work schedule, Dewane preferred that his wife collect and sort their mail and pay routine bills.
Lingering connections to Oregon have not prevented this court in past cases from concluding that a taxpayer effected a change in domicile. InHudspeth, the taxpayers
 "did not sell their home in Prineville, [Oregon], * * * the husband continued his Oregon Elks Lodge membership, * * * his Oregon voting registration remained on the books, * * * he maintained a bank account in Prineville, * * * he paid dues at the golf club in Prineville, * * * he purchased no home in * * * New Mexico, and made use of a mobile home in * * * Colorado."
Hudspeth, 4 OTR at 299. The taxpayer-husband in Hudspeth testified that he had tried to sell his Oregon home but found no takers, that he "did not vote by absentee ballot during his absence," and that he "had no time to take care of or give consideration to minor matters such as shifting bank accounts, cutting down on dues payments, and the like." Id. at 300. The court accepted his explanations and concluded that the taxpayers had effected a change of domicile. Id. at 301.
Like the taxpayer-husband in Hudspeth, it appears that Dewane retained several of his connections to Oregon largely because he did not have time to "take care of or give consideration to" matters that he considered to be relatively minor. It is clear from his testimony that he has always maintained an extremely full work schedule. As a result, it appears that he retained his *Page 15 
Oregon driver license, his Oregon voter registration, and his Oregon address on the SWEP, LLC agreement more as an oversight than as a conscious decision. He obtained his Oregon driver license and voter registration in 1980, and testified that he did not think to change either until 2006. Similarly, he testified that he initially included his Oregon address on the LLC agreement when he did not have a permanent Arizona address, and did not later think to change the address.
Despite the connections that he retained with Oregon, Dewane realized by 2003 that he no longer considered himself an Oregon resident. He worked full time in Arizona, spent most of his time in Arizona, and owned a home in Arizona to which he intended to retire. Furthermore, all of his children were attending school in Washington and, as a result, his wife was spending more time with him in Arizona. Thus, he felt uncomfortable declaring himself an Oregon resident on his tax returns and, of his own volition, contacted the Arizona Department of Revenue to determine whether he was, in fact, an Arizona resident. Through this conversation and subsequent conversations with his CPA, Dewane concluded that he had abandoned his Oregon domicile and acquired an Arizona domicile. For this reason, he filed as a part-year Arizona resident in 2003 and as a full-year Arizona resident in 2004 and 2005.
As in Hudspeth, the court "was impressed by the character of the plaintiffs and believes that their evidence attests to a legal change of domicile for the period here involved." Hudspeth, 4 OTR at 301. Thus, the court accepts Plaintiffs' testimony and finds that, by 2003, Dewane had formed the requisite intent to abandon his Oregon domicile.
C. Intent to acquire an Arizona domicile
By 2003, Dewane had established numerous, substantial connections to Arizona. He owned and occupied a furnished, two-bedroom house in Arizona. He was a partner in SWEP, LLC, for which he also served as the Medical Director. Additionally, he was employed as the Yuma Regional Medical Center Director of Emergency Services and as the Sun Care Air *Page 16 
Ambulance Medical Director. He had continuously maintained an active Arizona medical license since 1990. He maintained Arizona registration of a vehicle during the tax years at issue. He maintained a checking account with an Arizona bank, which he identified as his primary bank and for which he used his Arizona mailing address. He availed himself of professional (accounting and legal) services in Arizona. Beginning in 2003, his wife visited him in Arizona more frequently because all but one of the children could drive. Finally, his children often visited him in Arizona when there were long breaks from school.
"Typically, the purchase of a home coupled with a job in a given locale is sufficient to establish domicile in that state." Backman v. Dept. ofRev. (Backman), 16 OTR-MD 156, 162 (1999).[18] Nevertheless, the court has held in several cases that a taxpayer was a resident of Oregon despite owning a home and maintaining employment in a state other than Oregon. However, the present case is distinguishable from each of these cases.
In White v. Dept. of Rev. (White), 14 OTR 319, 323 (1998), the court held that the taxpayer-husband was an Oregon domiciliary during the subject years, 1988 through 1990. In 1986, the taxpayer-husband was asked to serve on a Presidential Commission. White, 14 OTR at 320. He hoped to qualify for a pension and other benefits, so he accepted the position and moved to Washington, D.C. Id. Meanwhile, his wife continued to live and work in Oregon; she did not intend to move to Washington, D.C. Id. at 322. The taxpayer-husband purchased a one-occupant apartment in Washington, D.C. and moved his personal possessions there. Id. at 320-321. He joined a church in Washington, D.C. Id. at 321. He retained his Oregon driver license, but did not bring a car to Washington, D.C.Id. at 320-321. He was not registered to vote *Page 17 
anywhere during the subject years. Id. Contrary to his hope for promotion, he was selected for early retirement in 1992. Id. He could not find another job in Washington, D.C. and returned to Oregon. Id.
In White, the court noted that the taxpayer-husband was "navy, through and through," and, "[l]ike a career soldier whose bunk is his home, [he] had no intent with regard to a future location other than what the Navy might order." Id. at 320, 321. Fortunately, the law looks to a person's conduct to determine his intent, "no matter how subconscious it might be." Id. at 321-322. In concluding that the taxpayer-husband had not abandoned his Oregon domicile, the court noted several persuasive facts.Id. at 322-323. First, his wife remained in Oregon and expressed no intention of moving to Washington, D.C. Id. at 322. Second, although he purchased an apartment in Washington, D.C., he left much of his property in Oregon. Id. at 323. Finally, while attendance at church and other organizations provides some evidence of intent, "[s]uch conduct is not as determinative as actions which require the individual to make a conscious decision and declare their status" such as "registering to vote, filing income taxes as a resident, obtaining a fishing license or claiming resident tuition." Id. at 322.
The facts here are distinguishable from those presented by White for several reasons. First, the taxpayer-husband in White bought only a single-occupant apartment in Washington, D.C. Furthermore, his wife indicated that she would not move to Washington, D.C. Here, Plaintiffs purchased and furnished a two-bedroom house with a pool and, while Myla may be attached to the Weston home, she testified persuasively that she planned to move to Arizona after all of her children had moved away. Second, the taxpayer-husband in White served on a Presidential Commission in Washington, D.C.; such a position is, by nature, readily influenced by changes in political leadership. *Page 18 
By contrast, Dewane's business activities in Arizona had become very stable by 2003. In particular, he testified that his ownership interest in an Arizona company afforded him a high degree of stability and job security.
In Backman, the taxpayer was a major league baseball player originally from Oregon. 16 OTR-MD at 157, 158. Over the course of his career, he played for teams in numerous states and purchased homes in a few of these states. Id. at 158, 159. Based on his pattern of moving from state to state, the court concluded that the taxpayer had never acquired a domicile in a new state and that Oregon was his domicile somewhat by default: "As [the taxpayer] moved between major league baseball teams, he kept his ties with Oregon. Oregon was the one constant element in [the taxpayer's] life." Id. at 163. The present facts are distinguishable from those presented by Backman because Dewane has not established connections with numerous different states. Rather, he has significant connections with only one state other than Oregon; namely, Arizona.
In Sage v. Dept. of Rev. (Sage), 19 OTR-MD 419, 432-433 (2007), the court concluded that the taxpayer had never abandoned his Oregon domicile, "in spite of the fact that he went to work in Washington 26 years before the first tax year at issue." The facts presented by Sage
are especially unique. The taxpayer in Sage was originally from Oregon and, even during his long career in Washington, maintained numerous connections to Oregon. Sage, 19 OTR-MD at 421-424. Specifically, he owned a large tract of land in Oregon where he kept an airplane and a trailer; he registered a business name in Oregon; his parents lived in Oregon; his primary bank account was in Oregon; he had an Oregon driver license; he was registered to vote in Oregon and did, in fact, vote in Oregon during the tax years at issue; he received his mail in Oregon; and he received some medical treatment in Oregon. Id. at 421-427.
The taxpayer in Sage also had numerous connections to Washington by virtue of his long-held job in that state. Additionally, the taxpayer married a Washington resident shortly *Page 19 
before the tax years at issue and, in March of the second tax year at issue, moved into her house in Washington. Sage, 19 OTR-MD at 423-424. While marriage and acquisition of a permanent residence are certainly significant events that might ordinarily constitute a change in domicile, the facts in Sage suggested otherwise. During the first tax year at issue and part of the second, the taxpayer continued to reside at a mobile home park near his work site and continued to receive the majority of his mail in Oregon. Id. at 423-424. Thus, it did not appear that anything changed in his life until March of the second tax year at issue, at the earliest.
Ultimately, the court in Sage concluded that the taxpayer had not abandoned his Oregon domicile and acquired a domicile in Washington during the tax years at issue. Sage, 19 OTR-MD at 435. Of particular significance to the court in reaching this conclusion was the fact that the taxpayer had "asked his employer to withhold Oregon income taxes from his paychecks throughout the time that he worked [in Washington] because, according to the testimony, [he] `thought [he] was probably still an Oregon resident.'" Id. at 435. Specifically, the taxpayer "voluntarily had his employer withhold Oregon tax monies because he believed that it was his civic duty to pay taxes because he owned property in Oregon, and had been born and raised there." Id. at 429. Furthermore, he "originally filed Oregon resident returns for 2002 and 2003" and only filed Oregon non-resident returns after learning that one-half of his wife's earnings were subject to taxation by Oregon because Washington is a community property state. Id.
While the facts presented here do bear some similarities to those inSage, the cases are ultimately distinguishable. Perhaps the most notable distinction is that, up to and including the tax years at issue, the taxpayer in Sage had consciously considered himself a resident of Oregon. Indeed, he considered it his civic duty as an Oregon landowner to pay taxes in Oregon and consistently instructed his Washington-based employer to withhold tax monies. It was not until he learned of the tax implications on his wife's income that he decided to declare himself a *Page 20 
Washington resident. While it is true that Dewane also concluded that he was no longer an Oregon resident during the course of his tax preparation, there is no suggestion that he filed as an Arizona resident to avoid paying state income taxes.[19] Rather, Dewane realized in reflecting on his strong connections with Arizona and on his family's dwindling connections with Oregon that he had abandoned his Oregon domicile and become a resident of Arizona.
Dewane has been a partner in an Arizona company without interruption since 1997. He has owned a home in Arizona since 2001. While it is true that the location of business activities and property are not the only factors relevant to a determination of domicile, they are the most relevant factors to a determination of Dewane's domicile.[20] As is clear from Plaintiffs' testimony, Dewane is deeply committed to his work as a physician. Indeed, at times in his life, he has spent between 110 and 120 hours per week at work. Since 1997, his work has firmly rooted him in Arizona. In 2001, he felt sufficiently secure in his position in Arizona to purchase a home there. Based on Dewane's strong and enduring connections to Arizona, the court finds that he established an Arizona domicile by 2003.
 IV. CONCLUSION
Plaintiffs have proven by a preponderance of the evidence that Dewane effected a change of domicile by 2003. By 2003, Dewane had (1) clearly established a residence in Arizona; (2) formed the intent to abandon his Oregon domicile, as demonstrated by his dwindling connections with Oregon and by his decision to file his tax return as an Arizona resident; and (3) formed the intent to adopt an Arizona domicile, as demonstrated by his extensive business activities and *Page 21 
home ownership in Arizona. The court concludes that Dewane was not a resident of Oregon within the meaning of ORS 316.027 during tax years 2003, 2004, and 2005. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted.
Dated this ___ day of March 2010.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This Decision was signed by Presiding Magistrate Jill A. Tanner onMarch 3, 2010. The court filed and entered the Decision on March 3,2010.
[1] When referring to a party in a written decision, it is customary for the court to use the last name. However, in this case, the court's Decision recites facts and references to two individuals with the same last name, Brueske. To avoid confusion, the court will use the first name of the individual being referenced.
[2] Weston is about 20 miles from Walla Walla.
[3] Dewane testified that one of his daughters died in 1996. Dewane testified that she is buried in a cemetery near the Weston home; Plaintiffs purchased burial plots for themselves next to their daughter.
[4] Dewane testified that his youngest son began seventh grade in Oregon in 2002, then transferred to a school in College Place, Washington during the 2002-2003 school year so that his older siblings could transport him to school.
[5] Dewane testified that, for one college quarter, his older son lived with his nephew in College Place, Washington. He did not recall the specific year, but believes it was 2005 or 2006.
[6] Dewane testified that his father also lived at the Weston home until he passed away in 2004. He testified that his father is buried near Weston, Oregon, in a plot chosen by Dewane's sister and mother.
[7] Dewane's mother spent most of her time with his sisters in other states. (Def s Ex A at 5.)
[8] Dewane's days off per month ranged from seven to 15. (Ptfs' Exs 14-16.)
[9] Several times each year, Dewane took longer vacations lasting one to two weeks. (Ptfs' Exs 14-16.)
[10] The airline tickets provided only account for roughly half of Dewane's time off from work. However, all of these tickets evidence air travel to and from Oregon/Washington, with the exception of a few indicating trips elsewhere.
[11] Most of the information provided details air travel by Dewane alone, typically from Arizona to Washington or Oregon. (Def's Ex D at 162-210; Def's Ex C at 83-123.)
[12] Myla testified at trial that her father still lives in Canada and the family would visit him from time to time.
[13] Dewane testified that the family traveled to Peru at some point during the tax years at issue.
[14] There was no testimony concerning whether Dewane has continuously maintained his Arizona medical license since 1990. However, there is no concern that he has been practicing medicine without a license.
[15] Plaintiffs did not provide checks written in 2003 or 2004.
[16] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to 2001 and 2003, which are identical as to the statutes referenced.
[17] Unless otherwise noted, all references to the Oregon Administrative Rules (OAR) are to 2001 and 2003, which are identical as to the rules referenced.
[18] For instance, in Bleasdell, the court found that the taxpayer-husband had abandoned his Oregon domicile and acquired a Florida domicile when he obtained employment and purchased a condominium in Florida. Bleasdell, 18 OTR at 354, 356. The court reached this conclusion despite the fact that the taxpayer-husband's wife and children remained at their Oregon home ("a 5.51 acre parcel with a house and a barn"). Id.
at 355.
[19] Arizona also imposes income taxes on its residents. See Ariz. Rev. Stat. § 43-102.A.4 (stating that it is the intent of the legislature to "impose on each resident of this state a tax measured by taxable income wherever derived").
[20] OAR 150-316.027(1)(1)(a) states that "[f]actors that contribute to determining domicile include family, business activities[,] and social connections."