IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| DAVID SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 150312N |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision, entered April 29, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals Defendant's Notices of Determination and Assessment dated February 3, 2015, for the 2010 and 2011 tax years. A trial was held in the Oregon Tax Courtroom on December 14, 2015, in Salem, Oregon. Steven B. Hval, Attorney at Law, appeared on behalf of Plaintiff. Plaintiff testified on his own behalf. James C. Strong, Assistant Attorney General, appeared on behalf of Defendant. Plaintiff's Exhibits 1 to 14 and Defendant's Exhibits A to SS were received without objection. Plaintiff filed his Post Trial Brief on December 23, 2015. Defendant filed its Post-Trial Memorandum (Memo) on January 13, 2016. Plaintiff filed his Response to Defendant's Memo on January 29, 2016.

## I. STATEMENT OF FACTS

The parties agreed at trial that Plaintiff had an abode in both Washington and Oregon during the tax years at issue. (*See* Ptf's Post Trial Br at 1.) The parties further agreed that Plaintiff was domiciled in Oregon in 2008 and 2009. (*See id.*) The only issue is whether Plaintiff was domiciled in Washington or Oregon during the 2010 and 2011 tax years. (*See id.*)

A.    *Plaintiff's Early Years Through 2008*

Plaintiff was born in California and moved to Oregon in the third grade.[1]  He stopped living with his parents during his sophomore year in high school, but he remained in Oregon.  Plaintiff attended undergraduate and graduate school in Oregon.  From 1996 until 2002, Plaintiff worked for a company in Oregon.  Starting in 2002, Plaintiff worked for CareerBuilder in Chicago, although he continued to live in Oregon.  Plaintiff met his future wife, Kari, in 2002 and they married in May 2006.  In late 2005, he established a residence in the United Kingdom (UK) and worked for CareerBuilder UK.  Kari moved to the UK in the summer of 2006.  Plaintiff considered the UK to be his domicile as of 2006 and 2007.  While Plaintiff was working in the UK, he and Kari rented out their house in West Linn, Oregon.  They filed nonresident Oregon income tax returns in 2007 reporting their Oregon source rental income.

Kari became pregnant in 2007 and gave birth to a son in January 2008.  In November or December 2007, Plaintiff began feeling ill and saw a doctor in the UK.  In January 2008, Plaintiff's doctor diagnosed him with lymphoma and told him he had only a few months to live.  In February 2008, Plaintiff quit his job in the UK and made arrangements to return to his house in Oregon.  He returned to Oregon in March 2008.  Plaintiff then received additional medical tests and was diagnosed with sarcoidosis, an autoimmune disease, rather than lymphoma.  Plaintiff was treated by a specialist at OHSU, who was the only sarcoidosis specialist on the West Coast.  Plaintiff's treatment and recovery lasted two and one-half years, and he continues to manage his condition with medication.

/ / /

/ / /

---

[1] Plaintiff was the sole witness at trial; all facts stated in the Statement of Facts are based upon Plaintiff's testimony unless otherwise noted by a citation to an exhibit or other document or agreed upon by the parties.

In 2008, Kari started working part time for a Portland school district. She returned to work in 2008 primarily for health insurance and secondarily for financial reasons. Plaintiff filed an Oregon resident income tax return in 2008.

B.    *Recovery and Employment with PayScale: 2009*

In early 2009, Plaintiff began to feel well enough to work again and started taking on some projects. PayScale, Inc. (PayScale) contacted him in 2009 with an offer to oversee its sales and marketing. PayScale studies pay and compensation, gathers data, and creates and sells software with that data. On July 2, 2009, Plaintiff accepted PayScale's Offer of Employment (Offer) for the position of Vice President of PSP Sales, Marketing & Business Development.[2] (Ptf's Ex 1 at 1.) Upon acceptance of PayScale's Offer, Plaintiff received an option to purchase 750,000 shares of PayScale stock. (*Id.* at 4.) The Offer entitled Plaintiff "to earn an additional 300,000 shares of [PayScale's stock] after 6 months of service with the company and * * * relocation to Seattle." (*Id.*) Regarding Plaintiff's location, the Offer stated:

> "First Six Months: During the first six months you will commute to the PayScale office in Seattle from Portland. The company will cover the cost of commuting and lodging while in Seattle. During this period you will be in the Seattle office (or travelling on company business) an average of 4 days per week. On the remaining day you can work from Portland.
>
> "After Six Months: You will relocate your residence to Seattle. PayScale will help with the relocation. At this time we will review your compensation plan with respect [to] the change in cost of living from Portland to Seattle."

(*Id.* at 5.) Plaintiff's employment with PayScale commenced July 21, 2009. (*Id.* at 4.)

Plaintiff explained that, in 2009, PayScale was a group of venture capitalists and he needed to determine whether the venture was really a business and whether a market existed for its product. After a few months with PayScale, Plaintiff concluded that a market existed for the

---

[2] A letter dated October 30, 2013, from PayScale's Finance Department stated that Plaintiff "has been [PayScale's] Chief Revenue Office Since 2009." (Ptf's Ex 3 at 1.)

business, but the business was not executing properly. Plaintiff worked extensively with the sales team and the board. In October 2009, he began to feel confident in PayScale and decided to move to its headquarters in Seattle. Plaintiff moved to Seattle in December 2009. (*See* Ptf's Ex 4 at 1 (a letter from the Community Director at the Olivian stating that Plaintiff had been an occupant at the Olivian since December 3, 2009).)

C.    *Tax Years at Issue: 2010 and 2011*

In 2010 and 2011, Plaintiff continued to work for PayScale as Vice President of PSP Sales, Marketing & Business Development. In that capacity, he supervised about 50 people as of 2011. Plaintiff was an integral part of the company, especially with respect to product development and marketing. He often worked 50 to 60 hours per week, and sometimes up to 80 hours per week during the busy season.

In March 2010, he signed a lease of a two-bedroom, one-bathroom apartment in the Olivian in Seattle. (*See* Ptf's Ex 8 at 1 (a letter from the Senior Marketing Associate at Olive Way High-Rise LP stated that Plaintiff "originally moved into apartment #2009 here at The Olivian March 10, 2010").) The apartment was approximately 1,000 square feet. The Olivian is very nice and located one mile from Plaintiff's office; he could walk to work. Plaintiff initially rented some furniture for the Seattle apartment and eventually bought furniture and moved some from the West Linn house. Plaintiff's lease at the Olivian, dated September 19, 2011, listed Plaintiff as the only occupant. (Ptf's Ex 6 at 1.) The Renters Insurance policy for the Olivian had an effective date of March 15, 2010, and listed both Plaintiff and Kari as the insured. (Ptf's Ex 5 at 1.)

In 2010, Plaintiff and Kari still owned the West Linn house, which was about 2,600 square feet with three bedrooms. In 2010 and 2011, Kari was a tenured teacher in Oregon and

worked part time for the school district; her schedule was Monday, Tuesday, and half of Wednesday. Plaintiff's intent at that time was for Kari to finish the school year teaching in Oregon and then move to Seattle. During spring 2010, he began researching Seattle neighborhoods and looking for houses. In summer 2010, Plaintiff and Kari concluded that the Seattle public schools were not very good, and it was important to Kari that their son attend public school. Plaintiff testified that, at that time, the Oregon real estate market was bad, so they could not sell their West Linn house for enough to buy a house in Seattle. Kari was also worried about finding a teaching job in Washington; however, she did not apply for any jobs in Seattle in 2010 or 2011.

During 2010 and 2011, Plaintiff would visit his family in Oregon, and his family would visit him in Washington. He estimated that he spent between 30 and 50 days in Oregon in 2010, and approximately 60 days in Oregon in 2011. Plaintiff "regularly" traveled to Oregon on weekends. Plaintiff testified that his primary reason for traveling to Oregon was to visit Kari and their son, and he considered that time to be vacation. Kari would sometimes travel to Seattle during the latter half of the week. Plaintiff and Kari communicated through text messages and nightly video calls.

Plaintiff owned an automobile and held title in his name, but Kari used the automobile to commute. Plaintiff did not own a car in Seattle and did not drive to Oregon; instead, he typically took flights to and from Portland. He would often rent a car in Portland when he visited for a weekend. Plaintiff provided his checking account and credit card statements from 2010 and 2011. (*See* Def's Exs A through DD-2.) His American Express credit card statements detail airplane ticket purchases, including the passenger and flight locations. (*See, e.g.*, Def's Ex H-1 at 3.) Plaintiff's credit card statements also detail car rentals. (*See, e.g.*, Def's Ex M-1 at 4 (Avis

car rental to Plaintiff in Portland).) Based on Plaintiff's credit card statements, Defendant calculated that Plaintiff "purchased at least 44 flights between Seattle and Portland" in 2010 and "purchased at least 37 flights between Seattle and Portland" in 2011.[3] (Def's Post-Trial Mem at 2.) Defendant calculated that Plaintiff rented a car in Portland "at least nine times in 2010 and at least 44 times in 2011." (*Id.* at 3.) Plaintiff does not agree with Defendant's calculations. (*See* Ptf's Resp at 2.) Plaintiff testified that he had an "Alaska Airlines Wallet" that allowed him to prepay for airline tickets and to cancel or reschedule flights. He commonly prepaid for rental cars and airplane tickets, but did not use all of those reservations.

For two to three weeks each year, Plaintiff took a vacation with his family. They spent holidays in a variety of places: typically, the family spent Christmas with Kari's family in Springfield; Thanksgiving in Hawaii or Oregon; and summer birthdays and holidays in Seattle. Plaintiff's family typically came to Seattle over spring break and in the summer.

Plaintiff's parents lived in Oregon and helped Kari out with their son until Plaintiff's mother became sick. Plaintiff was not very close to his parents in the past, but he allowed them into his life in 2009 so that they could develop a relationship with their grandson. Plaintiff testified that visiting and caring for his parents was not a primary reason for his trips to Portland.

Plaintiff continued to take medication to manage his Sarcoidosis and he received a CT scan annually to monitor tumors. He was treated by the specialist at OHSU. In 2010 and 2011, Plaintiff went to the emergency room in Seattle for the flu, saw a dentist in Seattle, and received acupuncture and massage in Seattle. Plaintiff had a lawyer in Seattle.

/ / /

---

[3] Defendant's calculation included only "round trip direct flight[s] between Portland and Seattle." (Def's Post-Trial Mem at 2, n3.) It did not include "charges that reflect a one-way trip between Portland and Seattle or a trip with multiple stops that include both Portland and Seattle." (*Id.*)

Plaintiff banked with Wells Fargo and did most of his banking online. If he needed to conduct business in person, he went to the Wells Fargo branch near his office in Seattle. Plaintiff testified that his West Linn address was and is still on his bank records, in part because he receives statements electronically and has not thought about the mailing address, and in part because he finds it inconvenient to change his mailing address with the bank.

Many of the social events Plaintiff attended were networking events related to work. Plaintiff also developed close relationships with his co-workers in Seattle. Plaintiff is still in touch with friends in Oregon, but only sees them once a year or so. Most of his friends are now in Seattle. Plaintiff was a member of the West Linn golf club. The original membership fee was $25,000 with a monthly fee of about $400. Additional fees were due for carts, food, the pool, and other amenities. Kari and their son frequently visited the club. Plaintiff had a gym and recreational facility in his Seattle apartment, so he did not belong to any gyms. Plaintiff did not attend church in Oregon or Washington. He did not apply for any hunting or fishing licenses. In 2010, Plaintiff donated about $3,000 to the Woodland Park Zoo in Seattle.

Plaintiff filed his own 2010 and 2011 income tax returns with TurboTax. His 2010 and 2011 Form W-2s each listed Plaintiff's West Linn address. (*See* Def's Ex EE, FF.) Plaintiff's 2010 and 2011 Form W-2s were physically delivered to him, not mailed. Plaintiff noted that West Linn was his only address at the time he started working for PayScale. (Ptf's Resp at 1.)

D.      *Subsequent events: 2012 to Present*

On April 24, 2014, Plaintiff signed a new Employment Agreement with PayScale stating that, not later than September 30, 2014, Plaintiff would transition to Chief Product & Strategy Officer. (Ptf's Ex 2 at 4.) As of the date of trial, Plaintiff continued to live in Seattle and work for PayScale. He owned stock options worth about 2.5 percent of the company. As of the date

of trial, PayScale had about 248 employees and was worth just over $100 million. Plaintiff testified that he intends to continue living in Seattle and his plans are not contingent upon Kari and their son moving to Seattle, although he intends for them to move to Seattle.

As of the date of trial, Plaintiff lived in a one-bedroom condominium in Seattle. The Residential Rental Agreement for the term of June 17, 2013, to June 16, 2014, identified the occupants as "Dave Smith, wife [and], one child." (Ptf's Ex 7 at 1.) Plaintiff and Kari also owned a 5,000-square foot house with four bedrooms and four and one-half bathrooms in West Linn that they purchased for $1.3 million in 2014. (*See* Def's Ex JJ.) Plaintiff and Kari rented out their former West Linn house. (*See* Def's Ex KK.) Plaintiff testified that he viewed the new West Linn house as a good investment and an opportunity to make a profit. He thought he could sell the house for $1.5 million as of the date of trial.

As of the date of trial, Plaintiff's son attends elementary school in Oregon. Kari stopped working for the school district after spring 2015.

Plaintiff has had a Washington driver's license since 2013; previously he had an Oregon driver's license. (*See* Def's Ex MM.) Plaintiff obtained his Washington driver's license when his Oregon license expired. Plaintiff testified that he did not worry about obtaining a Washington driver's license before 2013 because he did not drive much. As of the date of trial, Plaintiff was registered to vote in Washington. He thought registration occurred automatically when he obtained a Washington driver's license. Plaintiff voted in Oregon in 2008, but does not generally vote in elections.

## II. ANALYSIS

The issue in this case is Plaintiff's domicile for the 2010 and 2011 tax years. Plaintiff maintains he was domiciled in Washington. Defendant maintains he was domiciled in Oregon.

ORS 316.037(1)(a) imposes a tax "for each taxable year on the entire taxable income of every resident of this state."[4]  ORS 316.027(1)(a)(A) defines resident or resident of this state as "[a]n individual who is domiciled in this state * * *."[5]  This court has explained:

> "The term 'domicile' is not defined in Oregon's tax statutes.  However, the term is commonly defined as:
>
>> 'The place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere.' "

*Ashby v. Dept. of Rev.*, 21 OTR 47, 51 (2012) (quoting *Black's Law Dictionary* 523 (8th ed 2004)).  "Every person has at all times one [domicile], and no person has more than one [domicile] at a time." *Zimmerman v. Zimmerman*, 175 Or 585, 591, 155 P2d 293 (1945).  "In order to change domicile, an individual must not only establish a residence in the new place but have an intention to abandon the old domicile and acquire a new one.  The intent to change domicile or to acquire a new domicile must be a present intent and not conditioned upon some future event or contingent event." *Davis v. Dept. of Rev.*, 13 OTR 260, 264 (1995) (citation omitted).

Plaintiff bears the burden of proof and must establish his case by a preponderance of the evidence.  ORS 305.427.  A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [his] burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

[5] ORS 316.027(1)(a)(A) includes an exception for individuals who do not maintain an abode in Oregon, maintain an abode elsewhere, and spend no more than 30 days per year in this state.  That exception is not applicable in this case because Plaintiff stipulated that he maintains an abode in Oregon and because he testified that he spent at least 30 days per year in Oregon.

"Because an intention to abandon one domicile and to establish another elsewhere is purely subjective, simple testimony from an individual as to his or her individual intent at any given time will not satisfy the burden of proof." *Dane v. Dept. of Rev.*, 21 OTR 15, 22 (2012). Accordingly, this court views a taxpayer's statements of intent with suspicion and looks to the overt acts of the individual to determine his or her true intent. *Hudspeth v. Dept. of Rev.*, 4 OTR 296, 298 (1971). "Nevertheless, the whole aim of the inquiry is to discern the [taxpayer's] true intent. The evidential value of each act must be measured with caution, since, in many cases, no particular act is wholly persuasive on either side of the argument." *Id.* at 299.

In this case, the parties agreed that Plaintiff maintained a residence in Washington in 2010 and 2011. Therefore, the court must determine whether Plaintiff intended to abandon his Oregon domicile and acquire a new domicile in Washington during the years at issue.

A.      *Plaintiff's Washington Connections*

The most persuasive evidence that Plaintiff intended to abandon his Oregon domicile and acquire a Washington domicile comes from his employment with PayScale. The terms of Plaintiff's employment offer from PayScale described an initial six-month period, starting in July 2009, in which Plaintiff would commute to Seattle and would receive compensation for his commuting costs. After six months, Plaintiff was required to relocate to Seattle. His relocation after six months was incentivized with additional stock options and a new compensation plan to reflect the cost of living in Seattle. Evidently, Plaintiff's physical presence in Seattle was important to PayScale. Plaintiff described his thought process during the latter half of 2009: he wanted to determine whether the venture was a viable business. In other words, Plaintiff sought to decide whether to make a commitment to PayScale.

/ / /

Plaintiff testified that, after October 2009, he decided to commit to PayScale and move to Seattle. His testimony is supported by evidence that he initially moved into the Olivian in Seattle in December 2009 and signed a lease in March 2010. In addition to acquiring a residence in Seattle, Plaintiff has committed significant time to PayScale, working between 50 and 80 hours per week. The majority of Plaintiff's social activities in Seattle are networking events related to work or gatherings with co-workers. Plaintiff's commitment to PayScale has paid off, and as of the date of trial, he owned approximately 2.5 percent of PayScale, which was valued at just over $100 million.

B.      *Plaintiff's Oregon Connections*

Plaintiff maintained a significant connection to Oregon even after moving to Seattle: his wife and their son remained in Oregon. Indeed, Plaintiff regularly traveled to Oregon to visit his family on weekends. Plaintiff estimated that he spent between 30 and 50 days in Oregon in 2010, and approximately 60 days in Oregon in 2011. Based on airline tickets purchased by Plaintiff, Defendant calculated that Plaintiff traveled to Oregon at least 44 times in 2010 and at least 37 times in 2011. Plaintiff disagreed with Defendant's calculation, noting that he did not use every ticket purchased. The court cannot be certain of precisely how many days Plaintiff spent in Oregon in 2010 and 2011, but the court is persuaded that, more weekends than not, Plaintiff visited his family in Oregon.

Plaintiff also maintained a house in West Linn during the tax years at issue, and even purchased a second house in West Linn in 2013, after which time he rented out the first house. Looking at Plaintiff's past actions with respect to that house, the court observes that Plaintiff did not sell it when he and Kari moved to the UK in 2006; instead, they rented it for additional income and filed Oregon nonresident returns reporting that income. Plaintiff testified that he

considered the West Linn house he purchased in 2013 to be a good investment opportunity. The court does not doubt Plaintiff's testimony, but observes that Plaintiff nonetheless enjoys the use of that house when he visits him family in Oregon. The court finds that Plaintiff's maintenance of the West Linn house and purchase of a second West Linn house were motivated by Kari's decision to continue living and working in Portland and by Plaintiff's interest in the investment opportunity. The court is not persuaded that Plaintiff continued to own the house in West Linn during the tax years at issue because he intended to return to that house in the future.

The court finds little probative value in Plaintiff's other connections to Oregon during the tax years at issue. Plaintiff continued to maintain his membership with the West Linn golf club, but he testified that Kari and their son frequently visited the club. Plaintiff testified that he did not drive often and that the car registered in his name in Oregon was used by Kari. Plaintiff's Wells Fargo bank account retained his Oregon address, but Plaintiff conducted his banking online so the mailing address was not a consideration for him. Plaintiff received medical care for his condition, sarcoidosis, at OHSU in Portland, but explained that his doctor was the only specialist on the West Coast. By contrast, Plaintiff obtained routine medical care in Seattle, presumably because he found it most convenient. Plaintiff held an Oregon driver's license during the years at issue, but when his Oregon license expired in 2013 he obtained a Washington license.

C.    *Determination of Plaintiff's Domicile*

Both Plaintiff and Defendant point to this court's prior cases to aid their respective positions. Plaintiff asserts that the facts in this case are similar to *Hudspeth* and *Brueske v. Dept. of Rev.*, TC-MD 090020D, WL 724425 (Mar 3, 2010). (Ptf's Post Trial Br at 10.) In *Hudspeth*, the taxpayers moved to Colorado for business reasons and established a new domicile there, even

though they only left Oregon for 16 months and maintained their Oregon home and other ties with the state during that time. *Hudspeth*, 4 OTR at 299. Similarly, in *Brueske*, the taxpayer moved to Arizona for work and established a new domicile there despite the fact that his wife, children, and mother lived in the family's Oregon home during the years at issue. *Brueske*, 2010 WL 724425 at *7.

Defendant argues that this case is similar to *Conway v. Dept. of Rev.*, TC-MD 150083C, WL 7920820 (Dec 4, 2015). In *Conway*, the taxpayer moved to Washington for work but maintained significant ties to Oregon, including the Portland home where her domestic partner continued to live during the years at issue. *Id.* at 1. In light of those ties, the court concluded that the taxpayer had failed to prove she intended to abandon her Oregon domicile. *Id.* at 4.

Both parties also offer competing citations regarding the significance the court should place on Kari and the couple's son remaining in Oregon while Plaintiff lived and worked in Seattle. In *Davis*, this court said "it is unlikely that one spouse would change his or her domicile unless the other spouse did so as well." 13 OTR at 264. Subsequently, in *Dane*, the court added: "However, unlikely is not impossible, and given the subjective nature of domicile it is possible that one spouse might consider time spent in a new location as a permanent relocation, while the other might view it only as a temporary sojourn. Who is right might only be knowable in retrospect." 21 OTR at 24 n5.

The above cases demonstrate that an individual's ties to a state through business activity, property ownership, and the presence of family, especially a spouse, are important factors that help reveal the individual's intended domicile; however, no one factor is dispositive. Moreover, the divergent results of those cases also reveal that the court's analysis must be driven by the facts of the case before it. This court has previously noted:

> "Case law can be instructive in ascertaining intent, but only to a point, because the outcome of each case is so heavily dependent on the facts and a slight variation can tip the scales in the other direction. Moreover, credible, persuasive testimony, as in *Hudspeth*, can drive the outcome, in spite of facts suggesting Oregon domicile."

*Bleasdell v. Dept. of Rev.*, 18 OTR 354, 362 (2004).

The two most significant aspects of Plaintiff's life during the tax years at issue were his wife and son, in Oregon, and his career, in Washington. The court finds no evidence to suggest that Plaintiff was influenced by any other connections to Oregon or Washington. The question is whether Plaintiff considered his home in Oregon with his family or in Washington with his career. Plaintiff characterizes his visits to Oregon as "vacation and [he] tries not to work so he can focus on his time with his wife and son." (Ptf's Post Trial Br at 6.) By contrast, Defendant characterizes Plaintiff's arrangement as "essentially commut[ing] between Seattle and Oregon, purchasing flights back and forth to see his family on the weekends – at least 33 in 2010 and 37 in 2011." (Def's Post-Trial Mem at 6.)

Work and family are often very important aspects of one's life, and each individual makes his or her own decision how to prioritize the two. New technologies and communication methods have made it easier for individuals to appear virtually rather than physically at home, work, and elsewhere. Given that the concept of domicile is closely related to physical presence, the ability of an individual to engage in many activities from any location makes it difficult to pinpoint a person's "true, fixed, principal, and permanent home." In this case, Plaintiff traveled to Oregon on many weekends and some holidays to spend time with his family in person, but he spent the majority of his time physically present in Seattle. In lieu of his physical presence in Oregon, Plaintiff routinely communicated with Kari through text messages and video calls.

/ / /

Plaintiff has made a significant investment in his career. He obtained undergraduate and graduate degrees, and then pursued employment with CareerBuilder that took him to the UK. Kari relocated to the UK with Plaintiff, and Plaintiff testified that he considered the UK to be his domicile in 2006 and 2007. Thus, Plaintiff's employment history demonstrates that he has been willing to relocate for work in the past. A health crisis brought Plaintiff back to Oregon in 2008, but he began considering employment opportunities as soon as he felt well enough to work again in 2009. When Plaintiff began working for PayScale in 2009, he proceeded cautiously and deliberately; he did not immediately move to Seattle, but instead agreed to a six month trial period during which he commuted to Seattle. That arrangement was explicitly stated in PayScale's employment offer. Subsequently, Plaintiff has continued to work for PayScale, increasing both his responsibility and compensation. No evidence was presented to suggest that Plaintiff will leave either PayScale or Seattle in the foreseeable future.

As of 2010 and 2011, Plaintiff hoped that Kari and their son would relocate to Seattle. He looked for suitable housing for his family in 2010. A variety of factors caused Kari to stay in Oregon rather than relocating to Seattle, including her job in Oregon, her employment prospects in Seattle, the public school system in Seattle as compared to West Linn, and the housing market in Seattle as compared to West Linn. The arrangement of Kari living in Oregon and Plaintiff living in Seattle has persisted in the years after 2011. Plaintiff hopes that Kari will ultimately move to Seattle. As this court observed in *Dane*, the outcome "might only be knowable in retrospect." 21 OTR at 24 n5.

This case presents a close call with respect to Plaintiff's domicile given his connection to Oregon through his family's presence in the state and his connection to Washington through his employment. Ultimately, the court is persuaded that Plaintiff more likely than not intended to

make a permanent move to Seattle in December 2009 in order to pursue a career with PayScale.

Plaintiff gave credible testimony that he intended to move permanently to Seattle in 2009, and in fact, he spent the majority of his time in Seattle during the tax years at issue. Plaintiff's continued employment with PayScale and residence in Seattle bolster that conclusion.

## III. CONCLUSION

After careful consideration, the court concludes that Plaintiff was domiciled in Washington, not Oregon, during the 2010 and 2011 tax years. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.

Dated this ____ day of May 2016.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on May 17, 2016.*